EMPLOYERS INSURANCE
OF WAUSAU, a Mutual
Company, Plaintiff,

v.

The DUPLAN CORPORATION, Laga Industries, Ltd., Panex Industries, Inc., Panex Company, Andreas Gal, Paul Lazare, Rochester Button Company, American Home Assurance Company, Continental Casualty Company, Federal Insurance Company, Fireman's Fund Insurance Company, Fireman's Insurance Company of Newark, New Jersey, Hartford Accident and Indemnity Company, National Union Fire Insurance Company of Pittsburgh, PA and Northern Insurance Company of New York, Defendants.

No. 94 Civ. 3143 (CSH).

United States District Court,
S.D. New York.

Sept. 11, 1995.

See also 1995 WL 15534.

Ross, Dickson & Masback, Washington, DC, William D. Hopkins, Siff Rosen, P.C., New York City (Louis G. Adolfsen, Neil L. Sambursky, of counsel), for defendant Hartford Accident & Indemnity Co.

Jackson & Campbell, Washington, DC (Richard Bryan, of counsel), for defendant American Home Assurance Co. and National Union Fire Insurance Company of Pittsburgh, PA, Fireman's Fund Insurance Co. of Newark, NJ.

Sheft & Sheft, New York City, Marian Hertz, Tofel Berelson Saxl & Partners, P.C., New York City (Robert L. Tofel, Mark A. Lopeman, of counsel), for The Duplan Corporation, Panex Industries, Inc., Laga Industries, Ltd.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Employers Insurance of Wausau ("Wausau") brought this declaratory judgment action to determine insurance coverage of claims arising from contamination of the "Turpentine Run Aquifer" (the "Aquifer") feeding numerous water wells in the Tutu Region of St. Thomas, United States Virgin Islands, and of additional pollution in Wellsville, New York. Wausau, Continental Casualty Company, Hartford Accident and Indemnity Company, and National Union Fire Insurance Company of Pittsburgh, PA (collectively the "Moving Insurers" or the "Insurers") presently move under Fed.R.Civ.P. 56(c), for a declaration that they are not required to defend or indemnify defendants Duplan Corporation ("Duplan"), Laga Industries, Ltd. ("Laga"), Panex Industries, Inc. ("Panex Industries"), Panex Company ("Panex Co."), Andreas Gal and Paul Lazare (collectively "the Duplan Defendants"), for claims asserted against them arising from the Aquifer's contamination. For their part, the Duplan Defendants cross-move for a declaration that the Moving Insurers are obligated to pay the costs of defending claims arising from the Virgin Islands pollution. Another insurer, Federal Insurance Company ("Federal"), moves to dismiss the Duplan

Ford, Marrin, Esposito, Witmeyer & Gleser, New York City (Charles A. Booth, of counsel), for defendant Continental Casualty Company.

Rivkin, Radler & Kremer, Uniondale, NY (Abbe L. Koplitz, of counsel), for defendant Firemen's Fund Insurance Co. and Federal Insurance Co.

Defendants' cross-claim against it which seeks payment of defense costs and indemnification under Director and Officer liability policies ("D & O policies") it issued to Panex Industries and/or the Panex Industries, Inc. Stockholders' Liquidating Trust (the "Panex Trust") from 1981 through 1993.

The motions were elaborately briefed and the Court heard oral argument. I have not considered any written submissions made after oral argument.

For the reasons explained below, I hold that because there is a reasonable possibility that the claims against them will give rise to a covered risk, the Moving Insurers are required to pay the costs of the Duplan Defendants' defense in claims arising from the Virgin Islands contamination. I further hold that the Duplan Defendants' cross-claim for coverage under the D & O liability policies issued by Federal must be dismissed because the third-party claims asserted against the Duplan Defendants are not covered under those policies.

## BACKGROUND

The undisputed facts are as follows.[1] From 1970 through 1979, Laga, a wholly-owned subsidiary of Duplan, owned and operated a textile manufacturing plant in the Tutu Wells section of St. Thomas, United States Virgin Islands (the "Laga site"). The Laga site is situated approximately 250 feet west of a tributary of the Turpentine Run Aquifer. In its manufacturing process, Laga used the chemical perchloroethylene ("PCE") to dry-clean fabrics. Defendant Laga was dissolved in 1981. In 1981, Duplan was reorganized under the bankruptcy laws and emerged from Chapter 11 bankruptcy as Panex Industries. Panex Industries was subsequently liquidated by a vote of its stockholders and the Panex Trust was formed on September 12, 1985 for the purpose of holding certain assets in order to satisfy the liabilities of Panex Industries. Andreas Gal and Paul Lazare were directors and officers of Duplan, Laga and Panex Industries. Gal and Lazare are presently the general partners of Panex Co., a New York state partnership which purchased the Laga site in late 1979 or early 1980 and sold it in 1982. The manufacturing plant was not operated during those years.

In 1987, the United States Environmental Protection Agency ("USEPA") discovered that a number of water wells fed by the Aquifer in the Tutu region of St. Thomas were contaminated by PCE, among other hazardous substances. In the wake of this discovery, the USEPA ordered the closure of numerous wells the Aquifer fed.

Four Winds Plaza Partnership ("Four Winds"), is the owner of a shopping center whose water wells were supplied by the Aquifer and contaminated by the hazardous substances which pervaded it. A number of individuals comprising collectively the "Harthman family" own just over 25 acres of land in the Tutu section of St. Thomas on which numerous of the contaminated water wells are located. P.I.D., Inc. Water Services, Limited, ("P.I.D.") and Tutu Services, Limited leased the lands and the water rights from the Harthman family. The Four Winds and Harthman/P.I.D. wells were all embraced by the USEPA's order of closure.

Inevitably, the contamination has not gone without attempted reparation by the aggrieved parties. In 1989, P.I.D. and Four Winds filed two separate, later consolidated, actions[2] in the federal district court of the District of the Virgin Islands (the "Virgin Islands action") alleging claims of nuisance, trespass, negligence, and strict liability against an assortment of defendants.[3] In 1990, P.I.D. amended its complaint to add seven members of the Harthman family as

---

1. With the exception of Federal's motion to dismiss, the present motions concern only the alleged contamination in the Virgin Islands. Accordingly, the facts and circumstances relating to the Wellsville, New York site will not be described.

2. These actions are captioned, *Harthman, et al. v. Texaco, Inc., et al.*, No. 89 Civ. 220, and *Four*

*Winds Partnership v. Texaco Caribbean, Inc., et al.*, No. 89 Civ. 224. The consolidated actions are together captioned *In re Tutu Wells Contamination Litigation.*

.3. Four Winds asserts an additional claim for contribution the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601 *et seq.*.

plaintiffs. In 1992, the P.I.D./Harthman plaintiffs filed their Fourth Amended Complaint and Four Winds filed its First Amended Complaint, both adding as defendants the Duplan Defendants. The Virgin Islands plaintiffs allege that the Aquifer was contaminated, *inter alia*, by PCE discharged from the Laga plant. In June of 1993, the USEPA issued a "Notice of Potential Responsibility" to Gal and Lazare for the costs of investigation and remediation of the contamination pursuant to CERCLA.

In April of 1994, Wausau commenced this action against the Duplan Defendants and a number of insurance companies which, along with Wausau, allegedly provided primary or excess liability insurance policies to all or some of the Duplan Defendants during the period from 1954 to the present.[4] The present motions followed.

## DISCUSSION

A. *Cross–Motions for Summary Judgment*

1. *Choice of Law*

■ Before turning to the substantive insurance coverage issues, I must first decide which forum provides the governing law. The Insurers pray for the application of New York law, while the Duplan Defendants contend that the law of the United States Virgin Islands applies. Because subject matter jurisdiction is supplied by diversity of citizenship, this Court must apply the choice of law rules of the forum state, New York. *See Klaxon v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

■ Under New York choice of law rules, the governing law is the law of the state which has the most significant contacts with the dispute. With respect to insurance coverage disputes in particular, "New York generally gives controlling effect to the law of the jurisdiction which has the greatest interest in the matter. Important factors in making this determination are, for example, location of the insured risk, residence of the parties, and where the contract was issued

and negotiated." *Munzer v. St. Paul Fire and Marine Ins. Co.,* 145 A.D.2d 193, 538 N.Y.S.2d 633, 637 (2d Dep't 1989) (citations omitted); *see also Avondale Industries, Inc. v. Travelers Indemnity Co.,* 774 F.Supp. 1416, 1422–23 (S.D.N.Y.1991) (under New York choice of law principles, where insured interests were located "in a wide geographic range," court applied law of state where policies were executed, issued and brokered, and where insureds had their principal place of business); *Olin Corp. v. Insurance Co. of North America,* 743 F.Supp. 1044, 1049 (S.D.N.Y.1990) (New York law applied to insurance coverage dispute where insured had principal place of business in New York and policies which covered risks nationwide were issued and delivered there, even though claim at issue involved pollution in Virginia), *aff'd,* 929 F.2d 62 (2d Cir.1991); *McGinniss v. Employers Reinsurance Corp.,* 648 F.Supp. 1263, 1267 (S.D.N.Y.1986) (in insurance coverage dispute, the residence of the insured and issuance of the policy in New York were sufficiently significant contacts to warrant choice of New York law).

■ In this case, the Moving Insurers contend the following with respect to the subject policies: (1) the principal place of business of the policyholder, Duplan and/or Panex Industries, was New York; (2) the insurance was purchased through brokers in New York; and (3) the policies were executed and delivered in New York.

The Duplan Defendants do not dispute that the principal place of business of Duplan and Panex Industries was New York, and that the policies were issued to a New York address. Nor do they offer evidence demonstrating that the policies were not executed in New York or obtained through New York brokers. Rather, their contention is that the record is not well enough developed to determine on this motion for summary judgment whether the policies were brokered in New York. The asserted need for further development of the record results from the Duplan Defendants' speculation that a Virgin Islands broker sometimes used by Laga may

---

4. Duplan and/or its successor Panex Industries was the policyholder named on all of the policies issued by the Moving Insurers.

have played a part in the negotiation of some of the policies. The Duplan Defendants do not present any evidence confirming the use of a Virgin Islands broker or rebutting the evidence offered by the Insurers on the use of New York insurance brokers. Significantly, however, they have not invoked the provisions of Rule 56(f) to seek a continuance for the purposes of engaging in discovery in order to adequately oppose the motion.

In short, the Insurers have come forward with evidence showing that the negotiation, execution and delivery of the insurance policies took place in New York, that the policies were issued to a corporation whose principal place of business was New York, and that the policies cover risks nationwide. The Duplan Defendants have failed to refute any of these propositions by admissible evidence. The Duplan Defendants' conjecture concerning the possible use of a Virgin Islands broker by a company covered under the policies but not the named policyholder, is simply insufficient to demonstrate a triable issue of material fact concerning the situs of the negotiation and execution of the policies. Applying New York choice of law principles to the facts at bar, I conclude that New York furnishes the governing law in this insurance coverage dispute. I would not alter this conclusion even if the Duplan Defendants were able to show that a Virgin Islands broker was occasionally used. Under New York choice of law principles, that single fact would not be dispositive of the choice of law.[5]

The Duplan Defendants contend, however, that having suffered the environmental consequences of the pollution, the Virgin Islands have the greatest interest in resolving this dispute and should therefore supply the governing law. This argument does not withstand scrutiny. While the location of the allegedly tortious or damaging conduct giving rise to liability may be a factor in the choice of law calculus, it is not dispositive, particularly where the insurance policies such as these cover risks in multiple states and territories. *See Monarch Insur-*

*ance v. Insurance Corp. of Ireland Ltd.,* 835 F.2d 32, 35–36 (2d Cir.1987) (under New York choice of law rules New York law applied to dispute concerning breach of reinsurance contracts where two insurers did business in New York, one insurer's principal place of business was New York, and one insurance contract was executed in, New York, despite fact that damage occurred in Ireland and tortious conduct occurred in New Jersey); *Olin Corp.,* 743 F.Supp. at 1049 (where risks covered were located in several states, fact that dispute involved only coverage at site in Virginia did not control choice of law); *U.S. Aviation Underwriters, Inc. v. United Coconut Chemical, Inc.,* 87 Civ. 5684 (MJL), 1992 WL 122787 *2 (S.D.N.Y. May 22, 1992) (fact that location of the risks may have been outside New York did not require foreign law to be applied; where policies were issued and delivered in New York, broker was located in New York and insured's principal place of business was in New York, New York law applied); *Maryland Casualty Co. v. W.R. Grace & Co.,* 88 Civ. 4337 (JSM), 1992 WL 142038, *2 (S.D.N.Y. June 9, 1992) (noting that it would be unusual and inconsistent to have the law of many different states apply to a single insurance contract based upon the situs of the underlying injury giving rise to liability) (citing cases); *cf. Borg–Warner Corp. v. INA,* 174 A.D.2d 24, 577 N.Y.S.2d 953, 956 (3d Dep't 1992) (New York law governed insurance coverage dispute where contracts covered number of sites, New York has a unique policy-based interest in pollution exclusion clause at issue, insured chose New York as forum for action, and Illinois law was unsettled).

Keeping in mind that interpretation and application of the insurance contracts is the centerpiece of this dispute, it is apparent that the sites of the Duplan Defendants' allegedly tortious actions and their environmental consequences is only indirectly relevant to this action. The insurance contracts at the heart of the summary judgment motions were negotiated, executed and delivered in New

---

**5.** Even if a more developed record would show what the Duplan Defendants surmise, moreover, it is difficult to see how Laga's use of a Virgin Islands insurance broker is of relevance to the present dispute. It would presumably have been *Duplan* as the named policyholder on the subject policies who would have retained an insurance broker to obtain the policies, not Laga.

York to a New York company and cover risks in more than one state or territory. It follows that New York has the greatest interest in this dispute's resolution, notwithstanding that the pollution occurred in the Virgin Islands.

Even if I were to accept the Duplan Defendants' contention that New York does not have the most significant contacts with the dispute, I would nonetheless hold that New York law governs this action because there is no conflict between New York law and the law of the Virgin Islands concerning the operation of the pollution exclusion clause on which the present dispute focuses. The choice between the law of New York and that of another state is a consideration only where a *conflict* exists between New York and foreign law. *See Zurich Insurance v. Shearson Lehman Hutton*, 84 N.Y.2d 309, 315, 618 N.Y.S.2d 609, 611, 642 N.E.2d 1065, 1067 (1994) (where no conflict exists between the law of New York and that of another state concerning particular issue, no choice of law problem arises); *Olin Corp. v. Insurance Co. of North America*, 762 F.Supp. 548, 558 (S.D.N.Y.1991) (choice of law question did not arise because laws of New York and Connecticut were not in conflict on dispositive issue of interpretation of pollution exclusion clause), *aff'd* 966 F.2d 718 (2d Cir.1992); *In re Wedtech Corp. v. Nofziger*, 88 B.R. 619, 623 n. 5 (Bankr.S.D.N.Y.1988) (noting that because no conflict existed between the law of Washington, D.C. and the law of New York on a dispositive issue,· choice of law problem did not arise).

This Court has discovered only one reported case applying Virgin Islands law interpreting a pollution exclusion clause containing a "sudden and accidental" exception which, as we shall see, is of primary concern in this case. As discussed below, that case is not in conflict with New York law on the subject. Since no conflict exists, New York law would govern in any event.

The Duplan Defendants submit that *C.H. Heist Caribe Corp. v. American Home Assurance Co.*, 640 F.2d 479, 483 (3d Cir.1981) conflicts with New York law because it af-fords a broad interpretation to the "sudden and accidental exception" in a pollution exclusion clause, assertedly in contrast to New York law. This contention is not borne out by an analysis of the case. In *Heist*, the court held an insurer obligated to defend a claim arising from personal injuries suffered by an individual while cleaning a tank containing toxic substances. The insurer argued that it had no duty to defend the insured because the claim fell within the policy's pollution exclusion. The Third Circuit disagreed. It held that the allegations in the complaint did not trigger operation of the pollution exclusion because the complaint did not allege that any pollutants had been discharged or released onto land, atmosphere or a body of water, as the pollution exclusion required. Moreover, the court held that because the allegations did not describe the occurrence of a non-accidental event, the complaint did not negate the possibility that the claim fell within the "sudden and accidental" exception to the pollution exclusion.

There can be no serious dispute that faced with those same allegations, New York courts would reach a similar result. As set forth *infra*, under New York law if the third-party complaint's allegations give rise to the possibility of a sudden and accidental discharge of pollution, the insurer is bound to defend. *Heist* is in accord with that principle. The broadly-worded complaint alleged no non-"sudden and accidental" event, thereby failing to negate the possibility of a covered occurrence.

To the extent the Duplan Defendants maintain that *Heist* narrowly interprets the pollution exclusion by limiting its application to only non-accidental events, that contention is unfounded. The *Heist* court's recognition that the allegations demonstrated the possibility of non-*accidental* discharge, and its concomitant failure to discuss whether the allegations raised the possibility of non-*sudden* discharge, is of no consequence. The court of appeals expressly declined to "decide whether the district court was correct when it held that [the pollution exclusion] excluded coverage only for nonaccidental [sic] environmental pollution." *Id.* at 483 n. 2.[6]

---

**6.** Three additional cases cited by the Duplan Defendants in an attempt to demonstrate that the

Moreover, even if I were to hold that under choice of law principles the law of the Virgin Islands applies to this case, because the law of the Virgin Islands is unsettled with respect to the interpretation of the "sudden and accidental" exception, I would be compelled to apply the law of New York and other leading jurisdictions in interpreting that exception. *See Rogers v. Grimaldi,* 875 F.2d 994, 1003 (2d Cir.1989); *Lenz v. Associated Inns & Restaurants Co. of Am.,* 833 F.Supp. 362, 378 n. 16 (S.D.N.Y.1993). As previously noted, the Court has discovered, and the Duplan Defendants have identified, only one case applying Virgin Islands law to a pollution exclusion clause similar to the one involved in the present action. Because there is no developed body of law on the subject, the law of the Virgin Islands is well short of settled. Accordingly, this Court would apply New York law interpreting the sudden and accidental exception which is in accord with the national trend, *see Technicon Electronics v. American Home Assurance,* 141 A.D.2d 124, 533 N.Y.S.2d 91, 99 (2d Dep't 1988), *aff'd,* 74 N.Y.2d 66, 544 N.Y.S.2d 531, 542 N.E.2d 1048 (1989); *Olin Corp.,* 762 F.Supp. at 558, even if New York did not have the most significant contacts with the dispute.

For all these reasons, New York supplies the governing law in this case.

### 2. *Duty to Defend*

Under New York law, an insurer's contractual duty to defend is broader than its duty to indemnify. *See Curtis v. Nutmeg Ins. Co.,* 204 A.D.2d 833, 612 N.Y.S.2d 256, 258 (3d Dep't 1994). An insurer's duty to defend arises when a complaint against the insured alleges facts, no matter how false or groundless, which give rise to any potential liability covered by the terms of the policy provided by the insurer. *See Technicon Electronics v. American Home Assurance,* 74 N.Y.2d 66, 73, 544 N.Y.S.2d 531, 533, 542 N.E.2d 1048, 1050 (1989). "[I]f there is a doubt as to whether the claim comes within the insurer's duty to indemnify, the insurer is generally required to furnish a defense, leaving the issue of indemnification to be settled after establishment of the insured's liability." *Village of Sylvan Beach v. Travelers Indemnity Co.,* 55 F.3d 114, 115 (2d Cir.1995).

When the insurer seeks to invoke an exclusion provision in order to be released from the duty to defend, it is incumbent upon the insurer to demonstrate that the "allegations of the complaint place that pleading solely and entirely within the policy exclusions, and, further, that the allegations, *in toto,* are subject to no other interpretation." *International Paper Co. v. Continental Casualty Co.,* 35 N.Y.2d 322, 325, 361 N.Y.S.2d 873, 875, 320 N.E.2d 619, 620 (1974) (quoted in *Technicon,* 74 N.Y.2d at 73, 544 N.Y.S.2d at 533, 542 N.E.2d at 1050). If the exclusion contains an exception for which coverage would obtain, the insurer also shoulders the burden of demonstrating that the exception does not apply. *State of N.Y. v. Blank,* 27 F.3d 783, 789 (2d Cir.1994).

Insurance coverage of the claims against the Duplan Defendants hinges upon the applicability of the pollution exclusion clause contained in each of the policies furnished by the Moving Insurers which strictly limits

laws of the Virgin Islands and New York conflict on the issue of interpretation of the pollution exclusion are inapposite.

*New Castle County v. Hartford Accident and Indemnity,* 933 F.2d 1162, 1198 (3d Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 1846, 123 L.Ed.2d 470 (1993), held that the term "sudden" is ambiguous and lacks a temporal element under the law of *Delaware,* not that of the Virgin Islands. *Hensley v. Life Ins. Co. of North America,* 551 F.2d 35, 37–38 (3d Cir.1977), applying Virgin Islands law, held that an intentional shooting was an "accident" under an "accident and health" policy. *Hensley* has no application to the construction of the term "accidental" under a pollution exclusion clause.

Finally, in *Evanston Ins. Co. v. Treister,* 794 F.Supp. 560, 572 (D.Virgin Islands 1992), the court held that an insurance policy's *absolute* pollution exclusion did not bar coverage of claims against the insured architect for damages arising from his negligent design and approval of the construction of water and sewer lines which ultimately led to pollution. The court concluded that the negligence claim was covered because it did not arise from, but existed independently of and prior to, the pollution. In this case, by contrast, there is no question that the damages arise from pollution and liability will be barred by the pollution exclusion unless the exception is triggered.

covered pollution risks. Each subject policy contains a standard pollution exclusion clause which reads substantially as follows:

"This insurance does not apply:

\* \* \* \* \* \*

to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is *sudden and accidental.*"

(emphasis added.) The parties' dispute on these motions centers upon the application of the last phrase of that clause which provides an exception to the coverage exclusion when the discharge is sudden and accidental (the "sudden and accidental exception").

From 1971 to 1982, New York law mandated inclusion of these standard pollution exclusion clauses in general liability insurance policies in order to prevent companies from purchasing protection for liability arising from their acts of pollution. *See* former N.Y. Insurance Law § 46; *Technicon Electronics,* 533 N.Y.S.2d at 102 (citing 1971 N.Y.Legis.Ann., at 353–354). Under these "unambiguously plain and operative" clauses, an occurrence will not fall within the exception, and coverage will not be triggered, unless the discharge was *both* sudden and accidental. *Technicon,* 74 N.Y.2d at 75, 544 N.Y.S.2d at 533, 542 N.E.2d at 1050; *Powers Chemco, Inc. v. Federal Ins. Co.,* 74 N.Y.2d 910, 911, 549 N.Y.S.2d 650, 651, 548 N.E.2d 1301, 1302 (1989). It follows that the failure to fulfill one of these two components defeats application of the exception.

To satisfy the "accidental" element of the inquiry, it is settled under New York law that the discharge must be unexpected and unintended. *See Powers Chemco,* 74 N.Y.2d at 911, 549 N.Y.S.2d at 651, 548 N.E.2d at 1302 (discharge resulting from purposeful conduct cannot be accidental); *Technicon,* 74 N.Y.2d at 75, 544 N.Y.S.2d at 534, 542 N.E.2d at 1051 (occurrence is not accidental when the discharge was deliberate

and intentional); *County of Fulton v. U.S. Fidelity and Guaranty Co.,* 195 A.D.2d 864, 600 N.Y.S.2d 972, 973 (3d Dep't 1993). As for the second prong, while the Court of Appeals has not defined the meaning of "sudden," most courts applying New York law have construed that term as having a temporal focus. Those courts have determined that a discharge cannot be regarded as sudden unless it is instantaneous or short-lasting. *See EDO Corp. v. Newark Ins. Co.,* 878 F.Supp. 366, 373 (D.Conn.1995) (collecting cases); *County of Fulton,* 600 N.Y.S.2d at 973; *Borg–Warner Corp. v. INA,* 577 N.Y.S.2d at 957; *Technicon,* 533 N.Y.S.2d at 99; *see also State of New York v. AMRO Realty Corp.,* 936 F.2d 1420, 1428 (2d Cir. 1991); *Ogden Corp. v. Travelers Indem. Co.,* 924 F.2d 39, 42 (2d Cir.1991); *cf. Redding–Hunter Inc. v. Aetna Casualty and Surety Co.,* 206 A.D.2d 805, 615 N.Y.S.2d 133, 135 (3d Dep't 1994) (pollution which resulted from discharge occurring over long period of time rather than abruptly or quickly did not fall within the ambit of the exception); *but see Allstate Ins. Co. v. Klock Oil Co.,* 73 A.D.2d 486, 426 N.Y.S.2d 603, 605 (4th Dep't 1980) ("sudden" need not be limited to an instantaneous happening).

The Duplan Defendants argue that sudden should not be temporally defined. Their argument has some surface appeal. Since sudden can mean either unexpected or abrupt, read in isolation it could feasibly lack a temporal element. But, sudden does not appear alone in the exception. Rather, it is used in the conjunctive with the adjective accidental, which means unexpected or unintentional. Given the inclusion of the word accidental in the phrase, if the word sudden is not accorded a temporal connotation it would converge with the term accidental to mean unexpected. In that case sudden would be rendered superfluous, an effect which the New York Court of Appeals clearly does not intend. Nor would that result comport with the general principle of contract construction which requires a court to ensure that every word in a contract is given meaning. In this regard, I am persuaded by those decisions holding that "sudden" has a tempo-

ral element. The reasoning of the *Borg–Warner* court is instructive:

> "By acknowledging that 'sudden' and 'accidental' are independent requirements, the [Court of Appeals in *Technicon* and *Powers Chemco* ] necessarily rejected the argument urged by plaintiff here that 'sudden' simply means 'unexpected' and is therefore synonymous with 'accidental.' Only by allowing 'sudden' to retain its temporal aspect does the term attain independent significance. Thus, for a release or discharge to be 'sudden' within the meaning of the pollution exclusion, it must occur abruptly or quickly or 'over a short period of time.' "

577 N.Y.S.2d at 957 (quoting *Technicon*, 533 N.Y.S.2d 91); *see EDO Corp. v. Newark Ins. Co.*, 878 F.Supp. at 372–374 (upon thorough analysis of construction of term "sudden" in "sudden and accidental" exception under New York and Connecticut law, court concluded that it has temporal element).

■ It should be noted that the focus of the "sudden and accidental" inquiry is upon the act of "discharge, dispersal, release or escape," not upon the pollution itself. Pollution may be entirely unintended, but if it results from intentional and systematic discharge the liability arising from the pollution will not fall within the ambit of the exception. It is therefore irrelevant under this analysis whether the resulting *pollution* was unexpected or unintended. *See Technicon*, 74 N.Y.S.2d at 75, 544 N.Y.S.2d at 533–34, 542 N.E.2d at 1050–51.

Applying these precepts, a number of courts have recognized that the discharge of hazardous substances which occurs as part of the insured's systematic practice of business does not fall within the exception. *See EDO Corp.*, 878 F.Supp. at 376 (release of pollutants occurring as a matter of course in the daily operation of a plant do not fall under exception); *Redding–Hunter*, 615 N.Y.S.2d at 135 ("[C]ourts have repeatedly concluded that waste discharges which are a concomitant of normal business activities are not 'sudden' within the meaning of the exclusion."); *County of Fulton*, 600 N.Y.S.2d at 974 (where insured regularly disposed of waste in landfill for years, discharge did not fall within exception); *Powers Chemco*, 549 N.Y.S.2d at 651 (purposeful business activity including burying drums containing wastes and discharging wastes through a pipe into pits was not accidental). This is because discharges which occur over a long period of time and result from intentional, purposeful activity are neither sudden nor accidental within the meanings ascribed by New York courts.

■ The P.I.D./Harthman and Four Winds complaints allege that from 1971 to 1979 Laga disposed of PCE through a pipe into an open pit located on the grounds of the Laga site. *See* Four Winds First Am.Compl. at ¶ 46; P.I.D./Harthman Fourth Am.Compl. at ¶ 55. These allegations fail both prongs of the sudden and accidental inquiry. The disposal is alleged to have occurred throughout the existence of the manufacturing process as part of the plant's standard operation. Such disposal is neither abrupt nor unintentional. Indeed, the Second Circuit applying New York law recently held that this precise method of disposal falls outside the sudden and accidental exception.

In *State of New York v. AMRO Realty Corp., supra*, the complaint against the insured alleged that it had disposed of hazardous substances through a pipe into a drainage ditch. The Second Circuit held that these allegations led to only one conclusion: "namely that the conduct alleged is that [the insured] intentionally and deliberately disposed of its wastes, among other places, into 'drains which discharged ... into a drainage ditch.' " 936 F.2d at 1428. The insurer was therefore not obligated to defend its insured as the allegations did not give rise to a claim falling within the policy's sudden and accidental exception. The court rejected the insured's argument that its lack of knowledge as to the ultimate repository of the waste made the discharge accidental. In language equally applicable to the present case, the court remarked:

> "The release of hazardous waste upon land or into a watercourse caused by the long-term industrial intentional disposal into a drain that leads to a ditch cannot be considered accidental merely because the disposer did not have an affirmative knowl-

edge of where the drain led. In such a case the insured may lack specific intent, but the release into the environment cannot be considered 'accidental.' "

*Id.*

 Just as in *AMRO*, the third-party complaints' allegations of the long-term systematic disposal of PCE through a pipe into a pit in the ground suggest the possibility of only intentional and long-lasting disposal of waste. The complaints contain no allegation suggestive of discharge caused by an abrupt, unexpected event.[7] Under New York law, accordingly, the claims do not give rise to a reasonable possibility of a covered risk under the policies' sudden and accidental exception.[8]

*Avondale Industries, Inc. v. Travelers Indem. Co.*, 894 F.2d 498 (2d Cir.), *cert. denied*, 496 U.S. 906, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1990), and *State of N.Y. v. Blank, supra*, 27 F.3d 783, cited by the Duplan Defendants, are not to the contrary. In both these cases the courts held that because the complaint against the insured alleged only the general disposal of hazardous substances without alleging any particular method of disposal, it did not clearly negate the possibility of sudden and accidental disposal and therefore contained allegations which potentially brought the actions within the purchased protection. *Avondale*, 894 F.2d at 500; *Blank*, 27 F.3d at 790–791. That same result does not obtain in this case where, by contrast, the third-party complaints against the Duplan Defendants allege a specific, inten-

tional method of disposal; namely, disposal through a pipe and into a pit on the grounds of the Laga site.

 The Duplan Defendants argue that even if the complaints' allegations do not reasonably suggest a covered occurrence, the Insurers have a duty to defend on the basis of extrinsic facts which demonstrate the possibility that the discharge of PCE, if caused by the Duplan Defendants, was sudden and accidental. Before the Court reaches the question of whether the extrinsic evidence that the Duplan Defendants have furnished demonstrates the possibility of sudden and accidental pollution, I must first decide whether under New York law the Duplan Defendants are entitled to have the Court consider it.

As noted above, the duty to defend is traditionally based upon a comparison of the allegations in the third-party complaint with the terms of the subject policy. Pursuant to this "four corners of the complaint" measure, if the complaint or third-party complaint alleges a potentially covered claim, the insurer cannot rely upon extrinsic evidence showing the allegations are baseless in order to *avoid* the duty to defend. The Duplan Defendants contend that the Court of Appeals' decision in *Fitzpatrick v. American Honda Motor Co.*, 78 N.Y.2d 61, 65, 571 N.Y.S.2d 672, 674, 575 N.E.2d 90, 92 (1991), renders this prohibition on the use of extrinsic facts unilateral by authorizing the *insured* to submit extrinsic facts to *establish* the duty to defend where the allegations in the complaint fail to

7. The fact that the complaint alleges negligence on the part of the Duplan Defendants does not force the allegations within the ambit of the sudden and accidental exception. Negligence does not connote "accidental" within the meaning of the exception. *See AMRO*, 936 F.2d at 1428; *accord Technicon*, 533 N.Y.S.2d at 95.

8. The Duplan Defendants suggest that because the third-party claims and cross-claims against the Duplan Defendants in the Virgin Islands action do not allege any specific method of disposal, they are so general as to fail to negate the possibility of a sudden and accidental method of disposal thereby giving rise to the duty to defend. This argument is misguided.

The third-party claims and cross-claims seek contribution toward any sum ultimately paid toward the P.I.D/Harthman and Four Winds plain-

tiffs. As such, they arise directly out of these complaints. Because the first-party complaints do not contain allegations reasonably suggestive of coverage, the third-party claims and cross-claims against the Duplan Defendants correspondingly fail to allege a covered occurrence.

Moreover, the third-party claims and cross-claims do specifically allege that the pollution resulted from the Duplan Defendants' routine business operation and that the PCE was disposed of on Laga's grounds or into a pit. *See* Wausau's Reply Memorandum at p. 9 (citing the relevant paragraphs of the cross-claims and third-party claims against the Duplan Defendants in the Virgin Islands action.) These constitute specific allegations of intentional disposal bringing the claims within the ambit of the pollution exclusion.

do so. The Insurers, for their part, acknowledge that *Fitzpatrick* approved the consideration of extrinsic facts to establish the duty to defend, but urges that its holding should be narrowly applied. An analysis of the decision in *Fitzpatrick* yields the conclusion that it does not have the narrow application suggested by the Insurers.

In *Fitzpatrick*, Frank Moramarco, an officer, shareholder and director of a landscaping company, was sued in an individual capacity for the wrongful death of an individual, John Fitzpatrick, resulting from injuries Fitzpatrick sustained in connection with landscaping Moramarco had hired him to perform as an independent contractor. The complaint alleged that Moramarco had been hired to perform the landscaping directly by the property owner. Upon notification of the claim, the insurer refused to defend Moramarco because he had not been sued in his capacity as an officer, shareholder or director of the insured landscaping company as required by the terms of the subject policy. The Appellate Division, reversing the Supreme Court, held that the insurer had no duty to defend Moramarco because the complaint was devoid of allegations suggesting that the claim arose in connection with his activities as an officer, shareholder or director of the insured.

The Court of Appeals reversed. It rejected the Appellate Division's declaration that the duty to defend analysis is confined exclusively to the allegations in the third-party complaint. Instead, the Court of Appeals concluded:

> "[I]n these circumstances, where the insurer is attempting to shield itself from the responsibility to defend despite its actual knowledge that the lawsuit involves a covered event, wooden application of the 'four corners of the complaint' rule would render the duty to defend narrower than the duty to indemnify—clearly an unacceptable result. For that reason, courts and commentators have indicated that the insurer must provide a defense if it has knowledge of facts which potentially bring the claim within the policy's indemnity coverage. We agree with these authorities and hold that, rather than mechanically applying

only the 'four corners of the complaint' rule in these circumstances, the sounder approach is to require the insurer to provide a defense when it has actual knowledge of facts establishing a reasonable possibility of coverage."

78 N.Y.2d at 66–67, 571 N.Y.S.2d at 674–75, 575 N.E.2d at 92–94 (citations omitted).

Despite this broad holding, the Insurers contend that the consideration of extrinsic facts authorized by *Fitzpatrick* should be restricted to those facts which clarify or expand upon the complaint's allegations, not those which contradict them, as the Duplan Defendants' evidence would. In view of the principles undergirding the *Fitzpatrick* decision, and an analysis of the cases which have subsequently applied it, I conclude that the Insurers' argument is unavailing.

*Fitzpatrick* is a broadly written opinion. As the dissent observed in criticism of the holding, "the majority today discards a rule of long standing ... abandon[ing] any truly objective standard by which to determine whether a duty to defend arises under the contract of insurance." *Id.* at 70–71 n. 1, 571 N.Y.S.2d at 677–678 n. 1, 575 N.E.2d at 95–97 n. 1. Several subsequent cases have cited it for the broad proposition that a "court, in deciding whether an insurer has a duty to defend, may consider extrinsic facts submitted by the insured to show that coverage under a policy may exist." *Petr–All Petroleum v. Fireman's Insurance*, 188 A.D.2d 139, 593 N.Y.S.2d 693, 695 (4th Dep't 1993); *see Continental Casualty Co. v. Rapid–American Corp.*, 80 N.Y.2d 640, 648, 593 N.Y.S.2d 966, 969, 609 N.E.2d 506, 509 (1993) ("An insurer must defend whenever the four corners of the complaint suggest—or the insurer has actual knowledge of facts establishing—a reasonable possibility of coverage."); *U.S. Fidelity & Guaranty Co. v. U.S. Underwriters Ins.*, 194 A.D.2d 1028, 599 N.Y.S.2d 654, 655–56 (3d Dep't 1993) ("USF & G") ("[I]f an insurer is aware of facts which indicate that the suit may involve events for which coverage is provided, a duty to defend will arise despite the fact that the complaint itself does not allege a covered occurrence.").

The Insurers raise the concern that broad application of the *Fitzpatrick* holding would

eviscerate the four corners rule and result in the unmanageable proliferation of collateral proceedings to determine whether there is a factual basis for the duty to defend based on the evidence submitted. While I recognize that allowing insureds to present facts extrinsic to the complaint to establish a duty to defend will reduce the certainty afforded in limiting the analysis to the complaint, that is a result fully contemplated by the Court of Appeals in *Fitzpatrick, see* 78 N.Y.2d at 68, 571 N.Y.S.2d at 675, 575 N.E.2d at 93. The court nonetheless held that despite the certainty provided by the four corners rule, the duty to defend derives from the insurer's *contract* with the insured, not from the complaint. *See id.* Measuring the duty to defend by the complaint's allegations alone undermines that principle, even though it may provide the insurer the comfort of certainty (not to mention an escape from responsibility under the policy).

The *Fitzpatrick* court also based its conclusion upon the familiar precept of insurance law that the duty to defend must be broader than the duty to indemnify. Following this principle, where facts demonstrate the possibility of a claim for which the insurer may ultimately have to *indemnify* the insured, the duty to defend must be triggered. There is no principled reason why that axiom supports consideration of only evidence that is consonant with the complaint's allegations. If the duty to defend is to be broader than the duty to indemnify, the insurer must defend if it has knowledge of any facts which give rise to the reasonable possibility of coverage—whether or not those facts contradict the complaint. Indeed, the extrinsic evidence at issue in *Fitzpatrick* showing that Moramarco was acting in his official capacity, was evidence in direct conflict with the complaint's allegation that he was hired as an individual.

Additionally, one of the two cases that have applied *Fitzpatrick*'s extrinsic evidence rule involved the consideration of extrinsic facts inconsistent with the complaint's allegations. *Safeguard Scientifics v. Liberty Mut. Ins. Co.*, 766 F.Supp. 324, 329–331 (E.D.Pa. 1991), *aff'd in part rev'd in part without opin.*, 961 F.2d 209 (3d Cir.1992), involved an insurance policy which covered only negligent or reckless, not intentional, defamation. Because the third-party complaint against the insured alleged intentional defamation, the insurer refused to defend. The court, applying *Fitzpatrick,* found that because the evidence adduced at trial on the underlying claim for defamation was inconclusive with respect to whether the false statements were made intentionally, on the one hand, or recklessly or negligently, on the other, the insurer had a duty to defend, because the complaint's could be amended to allege covered defamation.[9]

 Viewed against this background of concerns for maintaining a duty to defend broader than the duty to indemnify and enforcing the parties' contractual agreement, *Fitzpatrick* must be read to compel the consideration of any extrinsic facts presented by an insured to show the possibility of coverage. That being the case, I must now determine whether the facts submitted by the Duplan Defendants indeed demonstrate the reasonable possibility of coverage; that is to say, the reasonable possibility of a sudden and accidental event causing the discharge of PCE.

In their motion papers, the Duplan Defendants argue that the existence of twenty-two perforated and corroding 55–gallon drums behind the building on the Laga site demonstrate the possibility of covered sudden and accidental discharge. However, at oral argument on the motions before this Court held on July 17, 1995, the Duplan Defendants

---

**9.** The other case relying upon *Fitzpatrick* in finding a duty to defend based on extrinsic evidence is *USF & G, supra,* 599 N.Y.S.2d at 656. In *USF & G,* the court held that the insurer had a duty to defend a claim alleging injuries sustained by a patient at the insured infirmary. The court held that the complaint's allegations that the patient was left without care and supervision to roam the halls, *together with* a report which stated that the patient was confused but left to wander unsupervised, suggested the reasonable possibility of a covered claim for medical malpractice. Although the extrinsic evidence in *USF & G* was consistent with and expanded upon the allegations, nothing in that decision suggests that the court regarded *Fitzpatrick* as limiting the sort of evidence it could consider.

acknowledged that the existence of the barrels have no bearing on the Insurer's duty to defend. Accordingly, this Court will disregard that argument.

As clarified at oral argument, the Duplan Defendants contend that evidence they submitted in connection with their motion for summary judgment in the Virgin Islands action discredits the pipe and pit theory and shows that the discharge, if caused by Laga at all, could have *only* been the result of a sudden and accidental event.

The evidence upon which the Duplan Defendants principally rely to support their argument consists of: (1) deposition testimony of several individuals concerning the absence of a pipe through which PCE was disposed; (2) deposition testimony and other evidence showing that the dry-cleaning machine in which PCE was utilized was designed in such a way that the PCE could not have escaped onto the ground but for a sudden and accidental event; and (3) statements made by counsel for the Harthman plaintiffs in the Virgin Islands action suggesting that they have disavowed their "pipe and pit" theory. Taken together, the Duplan Defendants argue that this evidence demonstrates the reasonable possibility that if they are found liable for pollution it may have been caused by a sudden and accidental discharge.

To start with the last argument, the Duplan Defendants' suggestion that the Harthman plaintiffs have eschewed their "pipe and pit" theory and that the claim therefore no longer alleges intentional discharge is misguided. This contention is based upon statements made at oral argument on motions filed in the Virgin Islands action by counsel for the Harthman family, Gordon Rhea. His statements must be placed in context. Initially, Rhea's co-counsel James Hughes argued that deposition testimony of two former Laga employees supporting the pipe and pit theory was based on personal knowledge and therefore should be admissible. Following Hughes' argument, Rhea argued that plaintiffs could:

"prove beyond a reasonable doubt without any of those potential witnesses that Laga was a major contributor to PCE contamination in that aquifer. There is no ques-tion that Laga brought in gallon after gallon of PCE, which is a major contaminant, that it used it there over an extensive period of time, that at that time in the Virgin Islands on this record there was no approved EPA disposition site and that nobody from Laga now can say whatever happened to that PCE. All we know is that it disappeared.

We also know there were pipes running out the back of their building under the ground and we know when you dig wells, as several different parties including Laga's experts did, they turn out PCE below the ground below Laga and if you start working down gradient, you keep finding PCE and it shifts into higher PCE, TCE and vinyl chloride which are the breakdown products in the exact percentage expected to show direction or movement.

There is *no question they put it in the ground* and we have proven that the stuff was there.... So I think we can prove it beyond any doubt without these witnesses. And on the question of whether those witnesses [sic] are admissible, I think they have to say admission of a party opponent."

*See* Transcript of Oral Argument June 30, 1994, Exhibit P to Duplan Defendants Motion for Summary Judgment, section 7, pp. 87–88.

Viewed in context, the arguments of counsel for the Harthman plaintiffs confirm that, far from backing off the pipe and pit theory, those plaintiffs intend to press it and believe they can prove it either circumstantially or through the former employees' testimony. Although certain of Rhea's statements suggest that Laga's liability could be proved even in the absence of the pipe and pit method of disposal, his argument nonetheless suggests nothing other than disposal by Laga intentionally and in the regular course of its business. Accordingly, contrary to the Duplan Defendants' contentions, the statements made at oral argument by the Harthman counsel do not suggest the reasonable possibility of liability for any sudden and accidental pollution.

Having said that, I nonetheless conclude that the other evidence proffered by the Duplan Defendant does suggest that possibility. The Duplan Defendants contend that the Insurers know or should know that the pipe and pit theory of intentional pollution cannot withstand scrutiny because the deposition testimony of two of Laga's former employees upon which it is founded is hearsay, and because the deposition testimony of Laga's former plant manager, John Hartley, and another former Laga employee, Fernando Moscoso, demonstrates, in contrast, that no pipe existed. The Duplan Defendants' further argue that testimony of other individuals demonstrates that the PCE could not have escaped from the dry-cleaning machine onto the ground except suddenly and accidentally because the machine was designed as a closed system to contain and recycle the PCE.

I have reviewed transcripts of the deposition testimony submitted by the Duplan Defendants. The relevant testimony is as follows. John Hartley, Laga's former plant manager, and Fernando Moscoso, a former Laga employee, testified that they never saw a pipe projecting from the dry-cleaning machine in which the PCE was used. Moscoso also testified that he never observed a pit on the Laga grounds. John Evans and Thomas Rourk, employees of Lockwood & Greene, the firm that engineered and designed Laga's facility, testified that the facility was not designed to have any plumbing connected to the dry-cleaning machine. Pedrito Lanclos, an employee of the Virgin Islands Department of Education which subsequently occupied the Laga site, testified that he did not observe any pipe going through the floor of the building housing the dry-cleaning machine. Riley Kirk, the employee of the vendor of Laga's dry-cleaning system who trained Laga's employees on the system's use and periodically examined the system, testified that he saw no pipe running from the machine. Kirk further testified that the system was designed to be a closed system in which the PCE was recycled and that PCE should not have been discharged through the sewer system unless an accident such as a ruptured coil occurred. Finally, Raymond Machacek of the Arthur D. Little, Inc. consulting firm, testified that the dry-cleaning system Laga used was designed to recycle and reuse, not to discharge, any PCE that was not evaporated in the dry-cleaning process.

Based on my review of this testimony, I conclude that there is some evidence demonstrating that no drainage pipe extended from the dry-cleaning machine in which the PCE was used, and that no pit existed. The reasonable inference to be drawn from this evidence is that PCE could not have been discharged through a pipe and into a pit. As such, the evidence casts doubt, I put it no higher than that, on the viability of the pipe and pit theory relied upon in the third-party complaints. Moreover, the evidence submitted by the Duplan Defendants shows that the dry-cleaning machine in which the PCE was used was designed as a "closed system" in which the PCE either evaporated or was cleaned and recycled—never leaving the machine in liquid form. Given that the evidence submitted by the Duplan Defendants demonstrates that the pipe and pit theory may be untenable and that the system in which the PCE was contained was designed to be *closed* and not discharge the PCE, the possibility cannot be excluded that any discharge of PCE giving rise to liability on the part of the Duplan Defendants was sudden and accidental.

Although the Duplan Defendants have not come forward with concrete evidence of a sudden and accidental event causing discharge of PCE, I do not believe that they must do so to trigger the duty to defend. After all, the Duplan Defendants contend that they *did not* cause any discharge of PCE, and it is the burden of the Insurers to demonstrate that no possibility of coverage exists. With these observations in mind, I conclude that in the aggregate, the evidence submitted by the Duplan Defendants gives rise to the *reasonable possibility* that the Duplan Defendants may be found liable for the sudden and accidental discharge of PCE.

In so saying, I recognize that the facts are disputed. I do not undertake to reconcile the competing evidence or to determine the cause of the pollution, if any can be attrib-

uted to the Duplan Defendants. Instead, my obligation in determining whether a duty to defend exists is to decide whether the extrinsic facts of which the Insurers were or should have been aware demonstrate the reasonable possibility of a covered occurrence.[10] For the aforementioned reasons, I conclude that they do.

### 3. Duty to Indemnify

 The Moving Insurers also argue that they have no duty to indemnify the Duplan Defendants for any liability they incur as the result of the Virgin Islands pollution. An insurer's duty to indemnify arises only when the facts demonstrate that the insured's liability is actually covered by the policy. *See Servidone Const. Corp. v. Security Ins. Co.,* 64 N.Y.2d 419, 424, 488 N.Y.S.2d 139, 142, 477 N.E.2d 441, 444 (1985). Because the Insurers seek this declaration by way of summary judgment, it is useful to review the standards governing that relief.

 Under Fed.R.Civ.P. 56(c), the moving party is entitled to summary judgment if the papers "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." On such a motion, "a court's responsibility is to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.,* 933 F.2d 162, 167 (2d Cir.1991) (citing *Knight v. U.S. Fire Insurance,* 804 F.2d 9 (2d Cir. 1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987)) (citation omitted). The responding party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "The non-movant cannot 'escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts,' ... or defeat the motion through 'mere speculation or conjecture.'" *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d

118, 121 (2d Cir.1990) (citations omitted). While the party resisting summary judgment must show a dispute of fact, it must also be a material fact in light of the substantive law. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

 The Moving Insurers have submitted evidence in the form of testimony of two former Laga employees, Winston Smith and Anthony Richards, suggesting Laga's intentional discharge of PCE through a pipe into a pit on the Laga site. Even assuming this evidence would be admissible non-hearsay, the Duplan Defendants have come forward with contradictory evidence demonstrating that no such discharge could have occurred. Disputed issues of fact exist concerning whether or not Laga discharged PCE at all, and if so, whether that discharge occurred in the manner the Moving Insurers contend. These disputed issues of fact lie at the heart of the action because the method of discharge (if any) determines whether the resulting liability is covered. In the circumstances, summary judgment is entirely inappropriate.

### B. Federal's Motion to Dismiss

Federal moves to dismiss the Duplan Defendants' cross-claim seeking payment of defense costs and indemnification under D & O policies it issued to Panex Industries and/or the Panex Trust from 1981 through 1993 covering (for various periods) the directors and officers of Panex Industries and the Trustees of the Panex Trust.[11] The D & O policies exclude from coverage the cost of defense and liability for claims made against the insured "based on, attributable to, arising out of, resulting from or in any manner related to ... damage to or destruction of any tangible property including loss of use there-

---

**10.** There is no question that the Insurers are or should have been aware of these facts. The deposition testimony referenced was submitted in connection with the Laga Defendants' motion for summary judgment in the Virgin Islands action.

**11.** Although the Duplan Defendants also seek recovery under comprehensive general liability policies issued by Federal, the motion to dismiss does not extend to those policies.

of" (the "property damage exclusion"). They further contain an absolute pollution exclusion (the "pollution exclusion") which prohibits coverage of claims against the insured:

"(d) based on, arising from, or in consequence of:

(1) the actual, alleged or threatened discharge, release, escape or disposal of Pollutants into or on real or personal property, water or the atmosphere; or (2) any direction or request that the Insured test for, monitor, clean up, remove, contain, treat, detoxify or neutralize Pollutants or any voluntary decision to do so...."

*See* Memorandum of Points and Authorities in Support of Federal's Motion to Dismiss, at Exhibit D.

In their cross-claim, the Duplan Defendants allege that the D & O policies provide coverage for the costs of defense and any liability arising from the claims asserted against them in the consolidated Virgin Islands actions, the Wellsville action, and in the USEPA's Notice of Potential Responsibility for the Turpentine Run Aquifer. Because these third-party claims [12] on their face allege liability for property damage resulting from pollution, Federal contends they fall within both the pollution and property damage exclusions contained in the D & O policies and therefore fall outside the scope of the policies' covered risks.

While conceding that the operative complaints and the Notice of Potential Responsibility assert claims for property and pollution damage, and that their cross-claim does not "specifically mention" that any fiduciary duty claims have been asserted against them, *see* Duplan Defendants' Memorandum of Law in Opposition to Federal's Motion to Dismiss at p. 12 ("Memo. in Opp. to Federal's Motion"), the Duplan Defendants nonetheless argue that the claims against them *potentially* assert violations of the Trustees' statutory fiduciary duties and are therefore potentially covered. The Duplan Defendants point out that in opposing their motion to dismiss the Wellsville action, the State of New York ar-

gued that the Trustees' administration of trust assets constituted a breach of their fiduciary duty to the plaintiffs in that action, as creditors of Panex Industries, to allocate the trust assets ratably.

The heart of the breach of fiduciary duty claim, as described in the "Trustees' Petition for Instructions to the Delaware Chancery Court" (*see* Exhibit G to Duplan Defendants' Memo. in Opp. to Federal's Motion), is the Trustees' decision to allocate the bulk of the Trust's assets to settle certain claims in the Virgin Islands action. The Trustees' intention to use the Trust assets in that manner prompted motions by plaintiffs in both the Wellsville and Virgin Islands actions to enjoin payments from the Trust.

According to the Duplan Defendants, these "claims" (or their specter) arise independently from the pollution or property damage and relate solely and independently to the Trustees breach of fiduciary duties. The Duplan Defendants argue that claims against the Trustees concerning their administration of Trust funds fall outside the scope of the exclusions because the challenged actions of the Trustees have no connection to the pollution damage. As such, it is the Duplan Defendants' position that they constitute potentially covered claims under the policies for which Federal owes a duty to defend. This argument does not withstand scrutiny.

■ Even assuming that the assertion made by the New York Attorney General in the Wellsville action constitutes an actual claim and demonstrates the possibility that other similar claims may be lodged against them, such claims are not covered under the policies. The policies at issue preclude coverage for any claims that are "based on, arise from or in consequence of" pollution. Examination of the substance of the fiduciary duty claim demonstrates that it arises from, and is inextricably intertwined with, the claims of pollution damage asserted against the Duplan Defendants.

The Panex Trust and its Trustees are vital to the third-party actions precisely because, in light of Panex Industries' liquidation, the Trust represents the deep pockets into which

12. Federal argues that the Notice of Potential Responsibility does not constitute a "claim" within the meaning of the insurance policy. Be-

cause I conclude that even assuming it is a claim it would not be covered, I do not reach that issue.

the plaintiffs may reach for recovery of damages. As noted, the Trustees' actions are implicated by virtue of the method by which they propose to disburse trust funds to cover payment of claims for pollution damage. In charging that the Trustees breached their fiduciary duty, New York endeavored to show that Panex Industries was not insolvent and therefore subject to suit, and to ensure that enough assets remained in the Trust to fund any potential recovery resulting from the pollution damage allegedly caused by the Duplan Defendants. By raising the red flag of a fiduciary duty breach, the Attorney General sought to protect its ability to recover damages from Panex Industries' liability in the underlying pollution action, not to recover any additional or different damages resulting from the breach itself.

Viewed in this light, the allegations challenging the Trustees' exercise of their fiduciary duty do not convert what is fundamentally a pollution damage claim into a claim triggering Federal's duty to defend under the D & O policies. The Duplan Defendants' argument that no relationship exists between the fiduciary and pollution claims rings hollow. It is no mere coincidence that the fiduciary duty claim is asserted in an action seeking recovery for pollution damage. Quite the contrary, the fiduciary duty claim owes its very existence to the pollution damage claim. Any allegation challenging the Trustees' actions for improper Trust administration would simply be a corollary to the pollution claim—intended to have the effect of allowing the survival of Panex Industries as a defendant and ensuring the maintenance of a fund for recovery against pollution damage. As such, any actual or potential fiduciary duty claims against the Trustees are di-

rectly related to the pollution claims, notwithstanding the fact that the Trustees are not alleged to have actually *caused* the pollution for which recovery is sought.

It is an inescapable conclusion that any existing or potential claim alleging the breach of the Trustees' fiduciary duties in the administration of trust assets arises from the underlying claims alleging pollution damage. That being the case, Federal has no duty to defend or indemnify the Duplan Defendants for those claims under the D & O policies.[13]

### CONCLUSION

The Moving Insurers' motions for a declaration that they are not obliged to defend or indemnify the Duplan Defendants for claims of pollution arising from the Virgin Islands contamination are denied. The Duplan Defendants' cross-motion for a declaration that the Moving Insurers have a duty to defend the claims resulting from the Virgin Islands pollution is granted. Federal Insurance Company's motion to dismiss the Duplan Defendants' cross-claim seeking a declaration that Federal is obligated to defend and indemnify the Duplan Defendants for claims of pollution in the Wellsville and Virgin Islands actions pursuant to the subject D & O policies is granted.

The Clerk of the Court is directed to dismiss the cross-claim asserted by the Duplan Defendants seeking coverage under D & O liability policies issued by Federal.

SO ORDERED.

---

**13.** The Duplan Defendants also argue: (1) that the absolute pollution exclusion is ambiguous and should be interpreted in favor of not excluding coverage of pollution claims, and (2) that Federal's two-year delay in invoking the property damage and pollution exclusions for these claims effectively waives any policy defenses based upon them. These arguments are devoid of merit.

As Federal points out in its Reply Memorandum at p. 10, the New York courts that have construed similar absolute pollution exclusions have, consistent with the national trend, found them to clearly and unambiguously preclude coverage for claims arising from pollution. *See, e.g., Budofsky v. Hartford Ins. Co.*, 147 Misc.2d 691,

556 N.Y.S.2d 438, 440 (Sup.Ct.Suffolk Co.1990). The Duplan Defendants have offered no persuasive authority to the contrary.

As for the waiver argument, even assuming that it has a sound legal basis, its factual premise is flawed. Far from delaying invocation of the policy exclusions to deny coverage for years after it had notice of potential claims, Federal filed the present motion to dismiss on the basis of those exclusions even *before* the date on which the Duplan Defendants acknowledge that Federal was formally given notice of potentially covered claims under the D & O policies—November 7, 1994. *See* Memo. in Opp. to Federal's Motion at p. 3.