MARYLAND CASUALTY COMPANY,
Plaintiff,

W.R. GRACE & CO., Defendant–
Appellant,

v.

CONTINENTAL CASUALTY CO.,
Defendant–Appellee.

Docket No. 01–7482.

United States Court of Appeals,
Second Circuit.

Argued: Jan. 14, 2003.

Decided: June 13, 2003.

Anthony J. Marchetta, Pitney, Hardin, Kipp & Szuch, LLP, New York, NY, for Defendant–Appellant.

Elizabeth M. DeCristofaro (Charles A. Booth, William M. Harstad, and Sara A. Decatur, on the brief), Ford Marrin Esposito Witmeyer & Gleser, LLP, New York, NY, for Defendant–Appellee.

Before: KEARSE and B.D. PARKER, Jr., Circuit Judges, and RAKOFF, District Judge.*

B.D. PARKER, Jr., Circuit Judge.

This appeal concerns a series of rulings made by the United States District Court for the Southern District of New York (John S. Martin, Jr., *Judge*) over the course of ten years. At issue is defendant-appellee Continental Casualty Co.'s duty to defend defendant-appellant W.R. Grace & Co. for environmental claims arising from gradual pollution under three separate insurance policies that were in effect, for relevant purposes, from 1973 until 1984.[1] For the reasons that follow, we conclude that the District Court's rulings concerning the first two policies were correct, and we affirm the judgment of the District Court insofar as those two policies are

---

* The Honorable Jed S. Rakoff, of the United States District Court for the Southern District of New York, sitting by designation.

1. Grace challenges five decisions of the District Court: (1) a June 8, 1992 decision to apply New York law to all contract interpretation questions; (2) an April 28, 1994 decision denying Grace's motion for partial summary judgment and granting Continental's cross-motion for partial summary judgment; (3) an August 23, 1994 decision adhering to its previous rulings on the summary judgment motions; (4) a May 17, 2000 decision denying Grace's motion for partial summary judgment or to amend its cross-claims; and (5) a March 26, 2001 final judgment in favor of Continental, following a stipulation dismissing with prejudice Grace's remaining claims.

concerned. With respect to the third policy, however, we vacate the judgment of the District Court in favor of Continental and remand the case to the District Court.

## BACKGROUND

The issue on this appeal is whether, under three primary comprehensive general liability ("CGL") insurance policies in effect between 1973 and 1984, Continental had a duty to defend Grace in litigation involving claims arising from Grace's "gradual pollution" of the environment.[2] The first of these policies covered June 30, 1973 to June 30, 1976 (the "1973 Policy"); the second June 30, 1976 to June 30, 1983 (the "1976 Policy"); and the third June 30, 1983 to June 30, 1986 (the "1983 Policy").[3]

The 1973 Policy purported to insure Grace against claims of gradual pollution and provided that Continental's limit of liability for such claims would be:

> $200,000 each claim and $200,000 aggregate for injury to or destruction of property arising from gradual pollution or continuous discharge, leakage, or overflow of smoke, fumes, waste or other materials.

The 1973 policy contained an exclusion for property damage resulting from pollution that was not "sudden and accidental," but the exclusion applied only to the operations of Teal Petroleum Company, a subsidiary of Grace.

The 1976 Policy also purported to insure Grace for property damage resulting from gradual pollution up to a limit of $200,000, which was increased to $500,000 in June 1978. Like the 1973 Policy, the 1976 Policy also contained an exclusion for property

damage resulting from pollution that was not "sudden and accidental." Unlike the 1973 Policy, however, the 1976 Policy's pollution exclusion was not limited to one subsidiary of Grace. The exclusion provided that the 1976 Policy would not apply:

> to personal injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, oil or other petroleum substance or derivative, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere, or any water-course or body of water, but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

The proper interpretation of this pollution exclusion—in particular, the meaning of its exception for "sudden and accidental" discharges—is a central issue in this appeal.

The 1983 Policy also contained a gradual pollution clause (with a $500,000 limit on property damage coverage), as well as an exclusion for property damage arising out of pollution that was not "sudden and accidental." The pollution exclusion was identical to the one contained in the 1976 Policy.

Maryland Casualty Company, Grace's primary insurer from the late 1950s until 1973, sued Grace and Continental in the Southern District of New York in 1988. The complaint alleged that Grace and its subsidiaries may have been responsible for environmental contamination at nine waste disposal sites located throughout New York State. (Compl. ¶¶ 11–15.) The complaint further alleged that the New York

---

2. In 1997, the parties settled their dispute over Continental's duty to indemnify Grace for environmental claims. That settlement, however, did not encompass Continental's duty to defend.

3. While the 1983 Policy apparently covered June 30, 1983 through June 30, 1986, Grace's claims in this appeal are limited to the first year of that policy, June 30, 1983 through June 30, 1984.

Department of Environmental Conservation, the United States Environmental Protection Agency, and the City of New York were investigating Grace's potential liability for the contamination at these sites. (*Id.*) Maryland sought a declaratory judgment establishing that it was "under no obligation to provide Grace with any defense benefits or indemnification in connection with [the enumerated sites], or to pay any of Grace's expenses incurred in connection with those sites." (Compl. at 10.)

Before either defendant responded to the complaint, the action was stayed pending the outcome of a motion to dismiss in a related case Grace had filed in the Superior Court of Massachusetts. In the Massachusetts case, Grace contended that Maryland, Continental, and other insurers had provided coverage to Grace for certain environmental claims. *See W.R. Grace & Co. v. Admiral Ins. Co.*, No. 87–6624 (Mass.Super. Ct., Am. Compl. filed May 9, 1988). The Massachusetts Superior Court ultimately dismissed the *Admiral* case on grounds of *forum non conveniens.* Grace had also filed another action in Massachusetts Superior Court, in which it sought a declaration that various insurers were obligated to defend and indemnify it with respect to certain asbestos claims. The Superior Court dismissed that action on *forum non conveniens* grounds as well, concluding that New York would be a more appropriate forum than Massachusetts, and the Supreme Judicial Court affirmed. *See W.R. Grace & Co. v. Hartford Accident & Indem. Co.*, 407 Mass. 572, 583–86, 555 N.E.2d 214 (1990).

In the Southern District of New York action, Grace then asserted counterclaims against Maryland, cross-claims against Continental, and third-party claims against a number of its other insurers. Grace sought two forms of relief: (1) a declaration that the CGL policies obligated Maryland, Continental, and the other insurers to defend and indemnify Grace with respect to certain claims and liabilities arising out of environmental conditions at sites identified in certain underlying actions brought by various private and governmental parties; and (2) monetary damages for breach of the insurers' duty under the CGL policies to defend and indemnify Grace with respect to the underlying actions. (Answer, Countercl. and Cross-cl. of Def. W.R. Grace & Co. ¶¶ 26–27.)

After issue was joined, the parties disputed which state's—or states'—laws should be applied to the insurance policies. When the choice-of-law issue was before the District Court, Grace was seeking coverage for twenty-six sites located in twelve states, and Grace argued that the law of the state in which each site was located should govern the applicability of the insurance agreements to the claims arising out of that site. Of the twenty-six sites, nine were located in New York, more than any other state. The insurers argued that New York law should govern all the insurance policies, for all purposes. The District Court concluded that New York had the most significant contacts with the policies and, therefore, applied New York law to all contract interpretation questions. (Mem. and Order, June 8, 1992, at 4, 8.)

The litigation proceeded, and Grace and Continental filed cross-motions for partial summary judgment with respect to Continental's duty to defend. Grace moved for partial summary judgment on the ground that the administrative letters that it had received from state and federal governments constituted "suits seeking damages" within the meaning of the policy language, triggering the insurers' duty to defend. The District Court found that approximately half of the administrative letters triggered the duty to defend, but the court

nonetheless denied Grace's motion for partial summary judgment because it also found that "Grace has not established that it has provided timely notice of suit and occurrence to the insurers as the policies require." (Mem. Op. and Order, Apr. 28, 1994, at 8.) Continental cross-moved for partial summary judgment on its duty to defend Grace from gradual pollution claims. The District Court granted Continental's motion, concluding that: (1) with respect to the 1973 and 1976 Policies, New York Ins. Law § 46(13)-(14) prohibited the issuance of insurance for gradual pollution, and (2) with respect to the 1983 Policy (which was issued after the repeal of section 46(13)-(14)), Continental provided no insurance for gradual pollution, and undertook no duty to defend, because Grace's deductible for gradual pollution claims equaled the amount of its coverage. (*Id.* at 15–16.) The court granted Grace's motion for reargument on the effect of N.Y. Ins. Law § 46(13)-(14), but adhered to its previous ruling. (Mem. and Order, Aug. 23, 1994, at 1.)

Grace eventually settled with all parties except Continental, and all of the parties except Grace and Continental were eventually dismissed. Grace renewed its motion for partial summary judgment against Continental in January 2000, arguing for the first time that a 1990 settlement agreement modified the parties' insurance policies and obligated Continental to indemnify and defend Grace with respect to gradual pollution claims.[4] The District Court denied the motion, concluding that the 1990 agreement had no effect on the parties' obligations with respect to gradual pollution claims. The court relied on the "clear language" of the 1990 agreement, which provided that it would have no effect upon any of the parties' rights and ob-

ligations " 'except those relating to Products claims.' " (Mem. Op. and Order, May 17, 2000, at 2.)

In March 2001, Grace and Continental agreed to dismiss with prejudice all of the claims Grace had asserted to have arisen out of sudden and accidental pollution, "forever waiv[ing] coverage for these claims." (Final Judgment, Mar. 26, 2001, at 2.) Following this agreement, the District Court entered final judgment in favor of Continental. Grace appealed.

## DISCUSSION

Grace attacks the judgment of the District Court on four grounds. First, Grace challenges the District Court's decision to apply New York law to all contract interpretation questions. Second, Grace argues that the District Court erred in concluding that N.Y. Ins. Law § 46(13)-(14), which was in effect from 1971 until 1982 and which required all insurance policies to exclude coverage for non-"sudden and accidental" pollution, prevented Continental from insuring Grace against gradual pollution in the 1973 and 1976 Policies. Third, Grace challenges the District Court's conclusion that Grace was self-insured with respect to gradual pollution under the 1983 Policy. Fourth, Grace argues, based on the 1990 settlement agreement, that there were "cost caps" on the amounts that Continental could "charge back" to Grace under each of the policies, so that Grace was not actually self-insured for gradual pollution. We address these arguments *seriatim.*

## I. Choice of Law

 The District Court's decision to apply New York law to all contract interpretation questions was a legal decision,

---

**4.** The 1990 agreement settled unrelated litigation between Grace and Continental over

Continental's coverage of claims involving asbestos.

which we review *de novo*. *See, e.g., Curley v. AMR Corp.*, 153 F.3d 5, 11 (2d Cir. 1998). A federal court sitting in diversity applies the choice-of-law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The District Court was correct to apply New York choice-of-law rules.

■ "The first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved." *Allstate Ins. Co. and Stolarz*, 81 N.Y.2d 219, 223, 597 N.Y.S.2d 904, 613 N.E.2d 936 (1993). Grace argues that there is an actual conflict among the laws of various states in their interpretation of the phrase "sudden and accidental."[5] Continental does not dispute that this conflict exists but, rather, argues that it is irrelevant because N.Y. Ins. Law § 46(13)-(14), which required insurance policies to exclude coverage for claims arising out of pollution that was not "sudden and accidental," prohibited Continental from insuring Grace against losses resulting from gradual pollution. Continental cannot rely on section 46, however, unless New York law applies. Thus, the New York statute cannot determine the outcome of the choice-of-law analysis.

There is undoubtedly a conflict. New York law interprets the phrase "sudden and accidental" as having a temporal component, requiring that a discharge be both "sudden" and "accidental" in order to fall within the exception. *See Northville Indus. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 89 N.Y.2d 621, 632–33, 657 N.Y.S.2d 564, 679 N.E.2d 1044 (1997); *Technicon Elecs. Corp. v. Am. Home Assurance Co.*, 74 N.Y.2d 66, 75, 544 N.Y.S.2d 531, 542. N.E.2d 1048 (1989) (holding that "discharges that are either nonsudden or nonaccidental block the exception from nullifying the pollution exclusion"); *Borg–Warner Corp. v. Ins. Co. of N. Am.*, 174 A.D.2d 24, 577 N.Y.S.2d 953, 957 (App. Div.3d Dep't 1992) ("Thus, for a release or discharge to be 'sudden' within the meaning of the pollution exclusion, it must occur abruptly or quickly or 'over a short period of time.' " (citations omitted)). Other states, however, interpret "sudden and accidental" as having no temporal component, requiring only that a discharge be "accidental" and permitting gradual discharges to fall within the exception. *See, e.g., Morton Int'l, Inc. v. Gen. Accident Ins. Co. of Am.*, 134 N.J. 1, 71–72, 629 A.2d 831 (1993); *Joy Techs., Inc. v. Liberty Mut. Ins. Co.*, 187 W.Va. 742, 749, 421 S.E.2d 493 (1992); *Claussen v. Aetna Cas. & Sur. Co.*, 259 Ga. 333, 338, 380 S.E.2d 686 (1989). In light of this actual conflict between the law of New York and that of other states, we must determine which state's law to apply.

■ In contract actions, New York applies the "center of gravity" or "grouping of contacts" theory of conflicts of laws. *See Auten v. Auten*, 308 N.Y. 155, 160, 124 N.E.2d 99 (1954). Put differently, New York courts apply "the law of the place which has the most significant contacts with the matter in dispute." *Id.* at 160, 124 N.E.2d 99 (internal quotation marks omitted). Relying on § 188(2) of the Restatement (Second) of Conflict of Laws, the New York Court of Appeals has identified five factors relevant in determining which state has the "most significant relationship" to a contract dispute: (1) the place of contracting, (2) the place of nego-

---

**5.** As noted above, the 1973, 1976, and 1983 Policies each featured an exclusion for personal injury and property damage resulting from pollution, and each included an exception for pollution that is "sudden and accidental."

tiation of the contract, (3) the place of performance, (4) the location of the subject matter of the contract, and (5) the domicile or place of business of the contracting parties. *Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*, 84 N.Y.2d 309, 317, 618 N.Y.S.2d 609, 642 N.E.2d 1065 (1994).

▉ Grace does not seriously dispute that the balance of these factors favors New York. Indeed, Grace's counsel conceded before the District Court that "if one law were to apply, I would presume it would have to be New York." (Tr., Apr. 24, 1992, at 4.) The parties executed the three insurance policies in New York; much, though not all, of the negotiations occurred in New York; the policies were placed through Grace's New York-based insurance broker; the premiums were paid in New York; and, when all three policies were issued, Grace's principal place of business was in New York. While some of the negotiations took place in Illinois, Continental's principal place of business, these facts do not outweigh the numerous factors that favor New York as the center of gravity for the contractual relationship between Grace and Continental.[6] Regardless, Grace does not urge us to apply Illinois law to the three insurance policies.

Rather, Grace argues that the District Court erred in choosing to apply the law of only one state to the insurance policies. According to Grace, the court should have applied the law of the state in which each waste site is located in determining Conti-

nental's duty to defend with respect to the pollution that occurred at that site. At the time the District Court resolved the choice-of-law issue, Grace's position would have required the court to apply the laws of twelve states.[7] Grace's argument derives from § 193 of the Restatement (Second) of Conflict of Laws, which states, generally, that the rights created by an insurance contract "are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy." Grace argues that the parties understood the insured risk to be located throughout the United States, and that there is therefore no limit to the number of states' laws that can apply to the policies.

Grace's position defies both the law and the facts, as well as the traditional concerns of judicial economy and uniformity. First, the law. The very section of the Restatement upon which Grace places considerable reliance demonstrates the flaws in its argument. The language of § 193— applying the "law of the state" (not the "laws of the states") which the parties understood to be "the *principal location* of the insured risk" (not "all the locations of the insured risks")—suggests that the drafters of the Restatement did not intend for courts to apply the laws of more than one state to a single insurance policy. The use of the phrase "principal location" must mean that, where the insured risk is locat-

---

6. We are not the first court to hold, for choice-of-law purposes, that New York is the center of gravity of the contractual relationship between Grace and its insurers. *See W.R. Grace & Co. v. Cont'l Cas. Co.*, 896 F.2d 865, 873 (5th Cir.1990) ("New York was, by all accounts, the center of the relationship between Grace and the insurers."); *W.R. Grace & Co. v. Hartford Accident & Indem. Co.*, 407 Mass. 572, 584–86, 555 N.E.2d 214 (1990); *W.R. Grace & Co. v. Md. Cas. Co.*, 33 Mass.App.Ct. 358, 600 N.E.2d 176, 179 (Mass.

App.Ct.1992) (applying New York law because "New York had the most significant relationship with the parties and the transaction").

7. The litigation ultimately expanded to include more than 200 sites, and Grace would have had the District Court apply the laws of forty states to every contractual interpretation question.

ed in more than one state, courts should apply the law of the *one* state in which the parties understood the risk to be *principally* located. Making this point even more clearly, a comment to § 193 provides, under the heading "Principal location of risk":

> The location of the insured risk will be given greater weight than any other single contact in determining the state of the applicable law provided that the risk can be located, at least principally, in a single state. Situations where this cannot be done, and where the location of the risk has less significance, include: ... where the policy covers a group of risks that are scattered throughout two or more states.

Restatement (Second) of Conflict of Laws § 193 cmt. b. This comment lends unambiguous support to the District Court's decision to apply the law of only one state to each insurance policy.

We have previously endorsed, at least implicitly, the rule of comment b. In *Olin Corp. v. Ins. Co. of N. Am.*, 743 F.Supp. 1044 (S.D.N.Y.1990), *aff'd*, 929 F.2d 62 (2d Cir.1991) (per curiam), the district court applied New York choice-of-law rules to determine which state's law governed a dispute over several insurers' duty to defend and indemnify with respect to pollution claims. Analyzing the various grouping-of-contacts factors, the district court disregarded the location of the insured risk because "the risks covered by the insurance policies were not confined to any one principal location." *Id.* at 1049. Instead, the court relied on the other factors, all of which favored New York—the location of negotiations, underwriting, issuance, execution, and delivery of the insurance policies and the location of the insurer, the insured, and its insurance broker—and applied New York law because New York had the

most significant contacts with the dispute. *Id.* We affirmed "substantially for the reasons stated by [the district court]," noting specifically that "the district court properly chose to apply New York law to the insurance contracts." *Olin*, 929 F.2d at 64.

*Olin* is hardly an anomaly. It is commonplace for courts applying New York choice-of-law rules to disregard (or at least discount) the location of the insured risk when the risk is located in two or more states. *See, e.g., O'Neill v. Yield House Inc.*, 964 F.Supp. 806, 810 (S.D.N.Y.1997); *Employers Ins. of Wausau v. Duplan Corp.*, 899 F.Supp. 1112, 1117 (S.D.N.Y. 1995); *Sea Ins. Co., Ltd. v. Westchester Fire Ins. Co.*, 849 F.Supp. 221, 223 n. 1 (S.D.N.Y.1994), *aff'd*, 51 F.3d 22 (2d Cir. 1995); *Fireman's Fund Ins. Co. v. Schuster Films, Inc.*, 811 F.Supp. 978, 984–85 (S.D.N.Y.1993); *Avondale Indus., Inc. v. Travelers Indem. Co.*, 774 F.Supp. 1416, 1423 (S.D.N.Y.1991); *Reg'l Imp. & Exp. Trucking Co. v. N. River Ins. Co.*, 149 A.D.2d 361, 539 N.Y.S.2d 940, 941 (App. Div. 1st Dep't 1989) (holding that "a policy delivered to a New Jersey corporation to insure against a loss occurring 'anywhere' should be subject to the law of [New Jersey]").

Underlying the rule of § 193 comment b and *Olin*—that the location of the insured risk carries little weight in a choice-of-law analysis where the risk is scattered throughout two or more states—is an understanding that, barring extraordinary circumstances, only one state's law should govern an insurance agreement. If it were otherwise, there would be no reason to attach less significance to the location of the insured risk when the risk is dispersed among several states. Significantly, where the insured risk is scattered throughout multiple states, courts still deem the risk to be located principally in one state. In

*Steadfast Ins. Co. v. Sentinel Real Estate Corp.,* 283 A.D.2d 44, 727 N.Y.S.2d 393, 398 (App. Div. 1st Dep't 2001), for example, the court concluded:

> Given the nationwide scope of Sentinel's operations, the principal location of the insured risk should be deemed to be the State where Sentinel is incorporated and has its principal place of business, from which it negotiated the special terms of the Policy, and where the Policy presumably was delivered to it (thus constituting the state where the contract was made).

Thus, were we forced to choose one state as the principal location of Grace's insured risk under the Continental policies, that state would be New York.

The dearth of New York cases applying the laws of more than one state to an insurance policy—or any contract—is a significant factor in our decision.[8] In *Borg–Warner Corp. v. Ins. Co. of N. Am.,* 577 N.Y.S.2d at 956, an insurance coverage dispute involving contaminated landfill sites "scattered throughout the country," the court applied New York law to all contract interpretation questions. While Grace notes that none of the parties in *Borg–Warner* asked the court to apply the law of each state in which a site was located, that fact only highlights the weakness of Grace's position. Grace's choice-of-law argument—that the laws of as many as fifty states should simultaneously govern the same clause of the same insurance policy—would be amusing, had it not been

advanced with such sincerity. *Cf. Nat'l Starch & Chem. Corp. v. Great Am. Ins. Cos.,* 743 F.Supp. 318, 322 (D.N.J.1990) ("This case involves twenty-one different waste sites located in twelve different states. The parties do not argue that the law of a number of states applies, but rather, they argue that either New York or New Jersey law applies regardless of the locality of the waste sites.").

While Grace has cited several environmental insurance cases in which courts have applied the law of the state in which a site is located, none of the cases cited by Grace even approaches the nationwide scope of the instant action. Significantly, of the two New York cases that Grace cites in this regard, neither applied the laws of more than one state. *See G. Heileman Brewing Co. v. Royal Group, Inc.,* No. 88 Civ. 1041, 1991 WL 120366, at *3 (S.D.N.Y. June 21, 1991) (applying Michigan law); *Puro Int'l of N.J. Corp. v. Cal. Union Ins. Co.,* 631 F.Supp. 1226, 1228–29 & n. 3 (S.D.N.Y.1986) (applying New Jersey law). In *Heileman* and *Puro,* unlike the present case, the insured risk was located in one state, enabling the court in each case to apply that one state's law. In light of this distinction, and bearing in mind that Grace has not argued that the insured risk under the three policies at issue was principally located in any one state, neither *Heileman* nor *Puro* supports Grace's contention that the laws of fifty states might govern a single insurance policy.[9]

---

8. Grace has cited only two cases—both unpublished trial-court decisions—in which New York courts have held that an insurance policy was to be interpreted under the laws of more than one state. *See Employers Ins. of Wausau v. Am. Home Prods. Corp.,* N.Y.L.J., June 12, 1997, at 25 (N.Y. Sup.Ct. N.Y. Cty. June 12, 1997); *Aetna Cas. & Sur. Co. v. Witco Corp.,* No. 118985/93–037 (N.Y.Sup.Ct. N.Y.Cty. Sept. 15, 1995). These decisions are

contrary to the weight of New York authority, which generally opposes the application of multiple states' laws to a single insurance policy. Therefore, we do not follow them.

9. Grace also cites several cases from other jurisdictions, applying other states' choice-of-law rules, in support of its law-of-the-site argument. While that fact alone renders these cases of minimal value here, we note, in any

That the District Court did not err in applying New York law—rather than the laws of numerous states—is especially clear in light of the facts of this case. Significantly, this is not a dispute over Grace's liability for the pollution that occurred at the various waste sites, and the question of whether the victims of the pollution will be compensated is not involved. Rather, this is merely a dispute over who—Grace or Continental—must bear the cost of defending Grace against the various environmental actions. As the District Court aptly noted, "the interest [of a state in which a waste site is located] diminishes when the question is not whether someone will or can pay for the cleanup but rather who will pay." (Mem. and Order, June 8, 1992, at 5.)

Similar considerations animated the decisions of the Supreme Judicial Court of Massachusetts and the Fifth Circuit in other disputes between Grace and its insurers. *See W.R. Grace & Co. v. Hartford Accident & Indem. Co.*, 407 Mass. 572, 585–86, 555 N.E.2d 214 (1990); *W.R. Grace & Co. v. Cont'l Cas. Co.*, 896 F.2d 865, 874 (5th Cir.1990). The Massachusetts case involved a dispute over Grace's insurance coverage for asbestos claims under its excess CGL policies. The court affirmed a dismissal on *forum non conveniens* grounds, concluding that New York would be a more convenient forum than Massachusetts. This decision was based, in part, on the applicability of New York law to the parties' insurance dispute. The court stated:

> Whether there is a valid underlying asbestos-related claim against Grace in a particular circumstance will be determined by the applicable law in the forum where that claim is made. Whether, however, there is a duty to defend or to indemnify under a nationwide comprehensive general liability policy as to such a claim should not depend on the law of the jurisdiction governing that particular claim but rather should be determined by the law governing the interpretation of the insurance policy and its issuance.

*W.R. Grace & Co. v. Hartford Accident & Indem. Co.*, 407 Mass. at 585–86, 555 N.E.2d 214. The Fifth Circuit case also involved a dispute between Grace and its insurers over coverage for asbestos claims. There, as in the Massachusetts case, the court determined that New York law governed the dispute, even though the underlying asbestos-related injuries occurred in Texas. The Fifth Circuit concluded:

> It is important that neither Texas nor the School Districts [the plaintiffs in the underlying litigation] have any interest in whether the settlement is paid by Grace or, instead, by its insurers. Their only interest is in being paid, and they have been. Texas's interest in the School Districts' recovery against Grace ended with its settlement and payment. What remained was a dispute between Grace and its insurance carriers. It is New York, not Texas, that has the greater interest in and most significant relationship to the questions of insurance law that decide this dispute.

*W.R. Grace & Co. v. Cont'l Cas. Co.*, 896 F.2d at 874. The same rationale has driven choice-of-law decisions in other cases.

event, that in none of them did the court apply the laws of more than two states to a single insurance policy. *See, e.g., Leksi, Inc. v. Fed. Ins. Co.*, 736 F.Supp. 1331, 1334 (D.N.J.1990) (applying New Jersey law); *Transamerica Ins. Co. v. Thomas M. Durkin & Sons, Inc.*, No. 90–0968, 1991 WL 206765, at

*6–8 (E.D.Pa. Oct.1, 1991), *aff'd*, 983 F.2d 1052 (3d Cir.1992) (applying Pennsylvania and New Jersey law); *Chesapeake Utils. Corp. v. Am. Home Assurance Co.*, 704 F.Supp. 551, 557 (D.Del.1989) (applying Maryland and Delaware law).

*See, e.g., Golotrade Shipping & Chartering, Inc. v. Travelers Indem. Co.,* 706 F.Supp. 214, 218 (S.D.N.Y.1989); *Potomac Elec. Power Co. v. Cal. Union Ins. Co.,* 777 F.Supp. 968, 972 n. 10 (D.D.C.1991). Here, as in all of these cases, the dispute concerns nothing other than the rights and obligations of the parties to insurance contracts with which New York has the most significant contacts. Thus, New York's interest in this litigation is superior to that of any other state.

Lastly, we agree with the District Court that "concerns of judicial economy and uniformity require the application of New York law regardless of the place of the relevant site." (Mem. and Order, June 8, 1992, at 7.) The court was undoubtedly correct in observing that it would "burden this Court onerously" to consider the laws of many different states on every issue in the case. (*Id.*) Applying the laws of many states to a single contract would also, of course, make uniform interpretation of the contract impossible. Applying one state's law is also far more likely to be consistent with the expectations of the parties. It is unlikely that, in contracting for uniform nationwide coverage, the parties intended to subject each insurance policy to as many as fifty conflicting interpretations. We therefore affirm the District Court's decision to apply New York law to all contract interpretation questions.

## II. The 1973 and 1976 Policies

■ Having concluded that New York law applies, we must determine what effect—if any—the 1973 and 1976 Policies' pollution exclusion clauses—required by the since-repealed N.Y. Ins. Law § 46(13)-(14)—have on Continental's duty to defend Grace for claims arising from gradual pollution under those policies.[10] Recall that

the 1973 and 1976 Policies both contain clauses insuring Grace against personal injury and property damage arising from "gradual pollution," and that the 1976 Policy contains a broadly applicable pollution exclusion clause. While the pollution exclusion clause in the 1973 Policy applies, on its face, only to one subsidiary of Grace, section 46(13)-(14) required all insurance policies to exclude from their coverage damages arising out of non-"sudden and accidental" pollution. Therefore, we read the 1973 Policy as containing the same broadly applicable pollution exclusion clause as the 1976 Policy. *See Am. Ins. Co. v. Fairchild Indus., Inc.,* 852 F.Supp. 1173, 1180 n. 13 (E.D.N.Y.1994) (concluding that pollution exclusion applies to 1971 insurance policy that contained no such clause), *aff'd,* 56 F.3d 435 (2d Cir.1995).

While the clauses purporting to insure Grace for gradual pollution claims appear to conflict with the pollution exclusion clauses, any resulting ambiguity is illusory. To the extent the policies' gradual pollution coverage conflicts with the pollution exclusion clauses, that coverage would violate section 46(13)-(14), and we must interpret the policies to be in compliance with the statute. *See, e.g., Green v. Republic Steel Corp.,* 37 N.Y.2d 554, 558, 376 N.Y.S.2d 75, 338 N.E.2d 594, (1975) ("[P]ublic policy proscribes any provision of [a] contract that is in violation of statute."); *Metro. Life Ins. Co. v. Conway,* 252 N.Y. 449, 452, 169 N.E. 642 (1930) (Cardozo, C.J.) ("The [insurance] statute reads itself into the contract, and displaces inconsistent terms."); *In re Claim of Bahr,* 234 A.D.2d 836, 651 N.Y.S.2d 236, 237 (App. Div.3d Dep't 1996) ("Public policy dictates that when the terms of a contract contradict a State statute, the statutory provisions will prevail." (citation omitted)).

10. Section 46 was in effect from September 1, 1971 until September 1, 1982. Because it was repealed before the 1983 Policy was issued, it does not apply to that policy.

Thus, in accordance with section 46, neither the 1973 Policy nor the 1976 Policy insured Grace for damages arising from non-"sudden and accidental" pollution.

■ The question, then, is whether gradual pollution claims fall within the general pollution exclusion, on the one hand, or within its "sudden and accidental" exception, on the other. Grace can only prevail if gradual pollution can be considered "sudden and accidental" under New York law. Section 46(13) and (14) provided, in relevant part:

> Policies ... issued to commercial or industrial enterprises providing insurance against the legal liabilities specified in this subdivision shall expressly exclude therefrom liability arising out of pollution or contamination caused by the discharge, dispersal, release ' or escape of any pollutants, irritants or contaminants into or upon land, the atmosphere or any water course or body of water unless such discharge, dispersal, release or escape is sudden and accidental.

N.Y. Ins. Law § 46(13), (14) (McKinney Supp.1976) (repealed 1982). Section 46(13) applied to "[p]ersonal injury liability insurance," and section 46(14) applied to "[p]roperty damage liability insurance." *Id.* Otherwise, the two subsections were identical.

Grace makes two rather novel arguments in its effort to enforce the gradual pollution clauses of the 1973 and 1976 Policies. Grace argues that: (1) at the time of contracting, the phrase "sudden and accidental" was interpreted as including unintended, gradual pollution, and we should apply that contemporaneous interpretation even though it was later rejected by the New York Court of Appeals; and (2) the repeal of section 46 represented a change in the public policy of New York that should apply retroactively to insurance

policies that were issued while section 46 was still in effect.

Grace's primary argument—foreshadowed by the conflict of laws identified in section I, *supra*—is that the phrase "sudden and accidental," as used in both the policies' pollution exclusion clauses and section 46, means only "unintended" or "unexpected" and has no temporal component. No doubt because the New York Court of Appeals has squarely rejected this argument in two recent cases, *see Northville Indus. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.,* 89 N.Y.2d 621, 632–33, 657 N.Y.S.2d 564, 679 N.E.2d 1044 (1997); *Technicon Elecs. Corp. v. Am. Home Assurance Co.,* 74 N.Y.2d 66, 74–75, 544 N.Y.S.2d 531, 542 N.E.2d 1048 (1989), Grace argues that we should apply the interpretation of "sudden and accidental" that was in effect when the 1973 and 1976 Policies were issued (thereby ignoring the subsequent pronouncements of the Court of Appeals). Grace's argument is, to be kind, creative.

Perhaps the most glaring weakness in Grace's position is that there is no authority on which to conclude that, in 1973 and 1976, New York courts interpreted the phrase "sudden and accidental" to mean only "unintended" or "unexpected." Indeed, we are not aware of a single New York case interpreting the phrase "sudden and accidental" at all between the time section 46 was amended in 1971 and the time the 1973 and 1976 Policies were issued. Grace's argument for applying "contemporaneous" law to the 1973 and 1976 Policies must fail for this reason alone, as there does not seem to be any contemporaneous law to apply.

But there are other holes in Grace's position. Grace urges us to interpret "sudden and accidental" as that phrase was interpreted by two of New York's intermediate appellate courts in the 1980s

despite the fact that the cases are no longer good law. Before the Court of Appeals' decisions in *Technicon* and *Northville*, two intermediate appellate courts had defined "sudden and accidental" as having no temporal component, so that gradual pollution (*i.e.*, pollution occurring over a long period of time) could be "sudden and accidental," as long as it was unintended. *See Colonie Motors, Inc. v. Hartford Accident & Indem. Co.*, 145 A.D.2d 180, 538 N.Y.S.2d 630, 632 (App. Div.3d Dep't 1989); *Allstate Ins. Co. v. Klock Oil Co.*, 73 A.D.2d 486, 426 N.Y.S.2d 603, 604–05 (App. Div. 4th Dep't 1980).[11] There is no question that *Northville* effectively overruled all of the New York decisions that had interpreted "sudden and accidental" as having no temporal component. The court held that

> eliminating the temporal aspect from the meaning of sudden in the exception to the pollution coverage exclusion would render the sudden and accidental contingencies of the exception unavoidably re-dundant for unintended pollutant dis-charges. This redundancy is removed by including within the meaning of *sudden* in the pollution exclusion exception its temporal quality, as a discharge of the pollutant *abruptly, precipitantly or brought about in a short time.*

*Northville*, 89 N.Y.2d at 632, 657 N.Y.S.2d 564, 679 N.E.2d 1044 (emphasis in original). The *Northville* court also stated that "the temporal aspect of the sudden discharge element would only be met by the discharge, abruptly or within a short timespan, of a significant quantity of the pollutant sufficient to have some potentially damaging environmental effect." *Id.* at 634, 657 N.Y.S.2d 564, 679 N.E.2d 1044. We are aware of no authority for the proposition that we should interpret a New York statute in accordance with intermediate appellate decisions that have been overruled, rather than in accordance with the Court of Appeals decision that overruled them.[12]

---

**11.** Even before the Court of Appeals decided *Technicon* and *Northville*, not all New York courts subscribed to the view expressed in *Colonie* and *Klock*. In *Technicon* itself, for example, the Appellate Division, Second Department held that "[a] 'sudden and accidental' event is one which is unexpected, unintended and occurs over a short period of time." *Technicon Elecs. Corp. v. Am. Home Assurance Co.*, 141 A.D.2d 124, 533 N.Y.S.2d 91, 99 (App. Div.2d Dep't 1988), *aff'd*, 74 N.Y.2d 66, 544 N.Y.S.2d 531, 542 N.E.2d 1048 (1989).

**12.** We note that all the New York decisions of which we are aware that have interpreted the phrase "sudden and accidental" involved insurance policies that had been issued years before the court's ruling, and in none of those cases did the court apply any definition of "sudden and accidental" other than the one in effect at the time of its decision. *See, e.g., Technicon*, 74 N.Y.2d at 75, 544 N.Y.S.2d 531, 542 N.E.2d 1048 (applying ruling that "discharges that are either nonsudden or nonaccidental block the exception from nullifying the pollution exclusion" to insurance policies that had been issued in the 1970s); *Technicon*, 533 N.Y.S.2d at 93 (noting that insurance policies at issue covered "various periods of time from July 20, 1971, through August 1, 1980"). *See also, e.g., State of New York v. AMRO Realty Corp.*, 936 F.2d 1420, 1423, 1428 (2d Cir.1991) (applying conclusion that a gradual release of pollutants cannot be "sudden" to insurance policies that covered period from January 1, 1974 to January 1, 1983).

Thus, when the Court of Appeals unambiguously defined "sudden and accidental" in *Northville* in 1997, that definition became the law of New York, both with respect to insurance policies that had not yet been issued and with respect to policies that had been issued years earlier. Indeed, the policy in *Northville* had obviously been issued long before 1997, and there was no question that the Court of Appeals' interpretation applied to it. *See Northville*, 89 N.Y.2d at 630, 657 N.Y.S.2d 564, 679 N.E.2d 1044 (noting that Northville had discovered pollution, for which it sought coverage, in 1986).

■ Grace's second argument is that, whatever the meaning of "sudden and accidental," section 46 should not apply to the 1973 and 1976 Policies, and the gradual pollution clauses should trump the pollution exclusions. Grace argues that, even though section 46 was still in effect when the 1973 and 1976 Policies were issued, the subsequent repeal of section 46 in 1982 represented a shift in New York's public policy, creating an exception to the general requirement that contracts be interpreted according to the law in effect at the time they were made.

■ The general rule, which Grace does not seem to dispute, is that contracts are interpreted in accordance with the law in effect at the time of their formation. *See, e.g., Bloomfield v. Bloomfield*, 97 N.Y.2d 188, 194, 738 N.Y.S.2d 650, 764 N.E.2d 950 (2001). A natural corollary to this rule is that the repeal of a statute has no impact upon contractual rights that were established while the statute was in force. Thus, New York's General Construction Law provides:

> The repeal of a statute or part thereof shall not affect or impair any act done, offense committed or right accruing, accrued or acquired, or liability, penalty, forfeiture or punishment incurred prior to the time such repeal takes effect, but the same may be enjoyed, asserted, enforced, prosecuted or inflicted, as fully and to the same extent as if such repeal had not been effected.

N.Y. Gen. Constr. Law § 93 (McKinney 1951); *see also Char–Mo Investors, Inc. v. Market Ins. Co.*, 44 N.Y.2d 793, 794–95, 406 N.Y.S.2d 35, 377 N.E.2d 478 (1978) (Mem.) ("[I]t has been held that statutory modifications of a standard insurance policy are, generally, not to be applied retroactively to policies already in force on the effective date of the statutory amendments." (citation omitted)). Grace urges

us to apply the following exception: "The general principle that the validity of a contract depends upon the law that existed at the time the contract was made does not appertain to variations of the law that are made due to changes in public policy." *Bloomfield*, 97 N.Y.2d at 194, 738 N.Y.S.2d 650, 764 N.E.2d 950 (citations omitted). In the context of statutory repeals, the exception is:

> Where there has been a repeal of a prohibitory statute, which had rendered invalid a contract violative of its provisions, such a repeal will render the contract valid and enforceable and not subject to the defense of illegality. This principle, however, applies only to those acts of the Legislature which are strictly measures of public policy, not to those which are intended primarily to establish or affect the rights of parties as to each other.

*Goldfarb v. Goldfarb*, 86 A.D.2d 459, 450 N.Y.S.2d 212, 214 (App. Div.2d Dep't 1982) (citations omitted). Grace's argument obviously depends on our concluding that the 1982 repeal of section 46 represented a change in the public policy of New York.

There is scant support for Grace's contention that the repeal of section 46 represented "a drastic change" in New York's public policy that was intended "to encourage the sale of liability insurance covering unintentional pollution." (Br. on Behalf of Appellant W.R. Grace & Co.-Conn. at 93.) First, the repeal of section 46 neither required insurance companies to provide coverage for pollution-related claims nor encouraged them to do so; it simply made pollution insurance permissible. Second, the repeal was not a change in public policy. The specific policy that underlay the 1971 amendment to section 46 was "to assure that corporate polluters bear the full burden of their own actions spoiling the environment." *Technicon*, 533

N.Y.S.2d at 102 (quoting 1971 N.Y. Legis. Ann. at 353–54). The 1982 repeal of section 46 was based on a recognition that many industrial polluters, unable to obtain insurance for the consequences of their pollution, had been forced out of business, and thus rendered unable to bear the full burden of their pollution. *See id.* at 102–03 (citing 1982 N.Y. Legis. Ann. at 272); *see also Oates v. State of New York,* 157 Misc.2d 618, 597 N.Y.S.2d 550, 553 (N.Y.Ct.Cl.1993) ("[U]ninsured polluters went bankrupt or disappeared leaving no one to answer financially for the cleanup. Therefore in 1982, the insurance law was again amended, this time to remove the prohibition to coverage that the prior amendment had inserted."); *Cont'l Cas. Co. v. Rapid–Am. Corp.,* 80 N.Y.2d 640, 652, 593 N.Y.S.2d 966, 609 N.E.2d 506 (1993) ("Corporate polluters who could not insure themselves simply went out of business when the liability arose." (citation omitted)). The policy underlying the repeal of section 46(13)-(14) was consistent with the policy underlying the statute's enactment. All that changed in the intervening eleven years was an understanding of the best way of effecting that policy.

Thus, we agree with the District Court that the gradual pollution claims for which Grace seeks to recover its defense costs fall within the pollution exclusion clauses of the 1973 and 1976 Policies, and not within the "sudden and accidental" exception to those clauses. We therefore affirm the District Court's grant of summary judgment to Continental with respect to these policies.

## III. The 1983 Policy

Because section 46(13)-(14) does not apply to the 1983 Policy, the parties' dispute over Continental's duty to defend under that policy focuses on the language of the policy. Before turning to the particular provisions of the 1983 Policy, we note that an insurer's duty to defend is "exceedingly broader" than its duty to indemnify. *See, e.g., Erdman v. Eagle Ins. Co.,* 239 A.D.2d 847, 658 N.Y.S.2d 463, 466 (App. Div.3d Dep't 1997). "An insurer must defend whenever the four corners of the complaint suggest—or the insurer has actual knowledge of facts establishing—a reasonable possibility of coverage." *Cont'l Cas. Co. v. Rapid–Am. Corp.,* 80 N.Y.2d at 648, 593 N.Y.S.2d 966, 609 N.E.2d 506 (citations omitted). Significantly, however, "when the uncontroverted facts prove that no duty to indemnify exists the insurer must be relieved of its duty to defend." *Erdman,* 658 N.Y.S.2d at 466. Put differently, an insurer owes its insured no duty of defense "if it can be concluded as a matter of law that there is no possible factual or legal basis on which the insurer will be obligated to indemnify the insured." *Frontier Ins. Co. v. State,* 87 N.Y.2d 864, 867, 638 N.Y.S.2d 933, 662 N.E.2d 251 (1995).

The 1983 Policy, like its predecessors, contains both a pollution exclusion clause (with an exception for sudden and accidental pollution) and a gradual pollution coverage clause. To the extent these provisions conflict, however, it is clear that the gradual pollution clause was intended to "amend[ ]" the pollution exclusion, and the former controls. But that does not end our analysis, as the parties dispute whether the 1983 Policy's gradual pollution clause provides any coverage at all.

Continental contends that, under the 1983 Policy, it did not actually insure Grace for gradual pollution. Under the 1983 Policy, Continental's "limits of liability" for damages arising out of gradual pollution were "$500,000. per loss, and $500,000. aggregate." The policy also provided, with respect to deductibles:

[Continental's] obligation for all coverages contained in the policy shall be computed by subtracting from the amount of damages, or the "each occurrence" or "each claim" limit of liability, whichever is less, $500,000. single limit for all coverage and allocated claim expense combined.

According to Continental, its obligation for gradual pollution coverage can be computed by subtracting the deductible ($500,000) from the limit of liability ($500,000), leading to the conclusion that Grace was completely self-insured (*i.e.*, it retained all the risk) with respect to gradual pollution.

Grace disputes this contention, arguing, essentially, that Continental's arithmetic is incorrect because it ignores the fact that the $500,000 limit for gradual pollution coverage applies only to indemnity, not to defense, while the $500,000 deductible applies to both indemnity and defense. According to Grace, Continental would be liable for the amount by which the combination of indemnity (up to $500,000) and defense exceeded $500,000. The District Court agreed with Continental, concluding that the 1983 Policy

> provided for a deductible equal to the amount of the coverage provided. Continental assumed a duty to defend only "as respects the insurance afforded by this policy." Since for gradual pollution, the deductible equalled the coverage amount, Continental provided no insurance for gradual pollution and, therefore, it undertook no duty to defend.

(Mem. Op. and Order, Apr. 28, 1994, at 15–16.) We do not find the 1983 Policy to be quite so clear.

Continental's argument, and the District Court's conclusion, implies that the $500,000 limit of liability applies to both indemnity and defense costs, resulting in no possibility that Continental would ever have to pay Grace for either indemnity or defense of gradual pollution claims. This interpretation would require us to find that Continental did not insure Grace against losses resulting from gradual pollution at all, despite the policy's apparent statement to the contrary. While we do not question the legality of self-insurance agreements, *see, e.g., Ins. Co. of N. Am. v. Pyramid Ins. Co. of Bermuda Ltd.,* No. 92 Civ. 1816, 1994 WL 88701 (S.D.N.Y. Mar.16, 1994), we cannot conclude on the basis of the record before us that, with respect to gradual pollution, the 1983 Policy is such an agreement.

Nor, however, can we conclude that Grace did not retain all the risk of gradual pollution. In light of the conterminous deductible and coverage limit, the 1983 Policy can be interpreted, as Continental urges, as providing no coverage for gradual pollution at all. We cannot reject, as a matter of law, Continental's argument that the parties intended the 1983 Policy to provide no gradual pollution coverage.

In attempting to ascertain the extent of Continental's coverage under the 1983 Policy, we "must examine the entire contract to determine its purpose and effect and the apparent intent of the parties." *A. Meyers & Sons Corp. v. Zurich Am. Ins. Group,* 74 N.Y.2d 298, 303, 546 N.Y.S.2d 818, 545 N.E.2d 1206 (1989) (citation and internal quotation marks omitted). As we have already indicated, the intent of the parties regarding gradual pollution coverage is not clear from the record before us, which does not even include the entire 1983 Policy. Thus, resort to extrinsic evidence may well be required. *See, e.g., McCostis v. Home Ins. Co. of Ind.,* 31 F.3d 110, 113 (2d Cir.1994) ("When faced with ambiguity in an insurance policy, a reviewing court should consider extrinsic evidence submitted by the parties to assist in determining their actual intent."); *Lefrak Org., Inc. v. Chubb Custom Ins. Co.,*

942 F.Supp. 949, 952 (S.D.N.Y.1996); *Rivera v. St. Regis Hotel Joint Venture*, 240 A.D.2d 332, 659 N.Y.S.2d 270, 272 (App. Div. 1st Dep't 1997); *but see Int'l Bus. Machs. Corp. v. Liberty Mut. Fire Ins. Co.*, 303 F.3d 419, 426 (2d Cir.2002) (finding that "it is unclear whether New York law allows reference to extrinsic evidence in determining the duty to defend"). On remand, the District Court might find it helpful to consider extrinsic evidence in determining whether Continental has a duty to defend Grace from gradual pollution claims under the 1983 Policy. If neither the 1983 Policy as a whole nor such extrinsic evidence as is proffered makes the parties' intent clear beyond rational dispute, trial may be required.

Because it is unclear whether gradual pollution was among "the scope of the risks undertaken by" Continental in the 1983 Policy, we cannot determine whether Continental owed Grace a duty to defend. *N.Y. City Hous. Auth. v. Commercial Union Ins. Co.*, 289 A.D.2d 311, 734 N.Y.S.2d 590, 592 (App. Div.2d Dep't 2001); *Cuzzi v. Brook Shopping Ctr., Inc.*, 287 A.D.2d 403, 731 N.Y.S.2d 717, 718 (App. Div. 1st Dep't 2001). Accordingly, we vacate the District Court's award of summary judgment to Continental on its duty to defend under the 1983 Policy, and we remand this issue to the District Court.

## IV. The 1990 Settlement Agreement

In January 2000, nearly six years after the District Court had granted summary judgment to Continental with respect to its duty to defend, Grace moved again for partial summary judgment (or, in the alternative, to amend its cross-claim), arguing that a 1990 settlement agreement between Grace and Continental modified the parties' rights under the policies at issue here. The 1990 agreement settled a dispute over Continental's coverage of asbestos claims, and the agreement stated that it applied only to products claims.

Grace relies on the 1990 settlement agreement as evidence of so-called "cost caps" on the amounts that Continental could "charge back" to Grace. The theory is that, even though Grace's deductible equaled its indemnification sub-limit for gradual pollution claims, the cost caps "established a maximum amount that [Continental] could charge back to Grace for any specific policy term." (Br. on Behalf of W.R. Grace & Co.-Conn. at 71.) Once that maximum was reached, according to Grace, it would no longer be self-insured for gradual pollution.

Contrary to Grace's assertion, the 1990 settlement agreement is not evidence that the caps had been fully paid, at least not insofar as gradual pollution claims are concerned. First, like the District Court, we deem it significant that Grace did not submit the 1990 settlement agreement to the court until nearly six years after the court had resolved the parties' cross-motions for summary judgment. Second, we also agree with the District Court's interpretation of the 1990 agreement. Relying on the agreement's plain language, the District Court concluded that it had no bearing whatsoever on gradual pollution claims. Two provisions of the 1990 agreement are relevant. First, the final "whereas" clause states that Grace and Continental "have entered into this Agreement *solely* to resolve their disputes under the Primary Policies [*i.e.,* the 1973, 1976, and 1983 Policies] concerning coverage for Products Claims." (Posner Aff., Sept. 30, 1999, Ex. 1 at 3 (emphasis added).) Next, and even more clearly, section 11(h) of the agreement provides:

Nothing in this Agreement shall be construed to reduce, alter, modify, or affect the following: (a) the parties' rights and obligations under the Primary Policies,

except those relating to Products Claims, or (b) the parties' rights and obligations under any insurance policies other than the Primary Policies.

(*Id.*, Ex. 1 at 14.) Thus, it is abundantly clear that the 1990 settlement agreement had no impact on gradual pollution claims (or, for that matter, on anything other than products claims). Accordingly, this agreement is of no value to Grace in its effort to prove that Continental has reached the "cap" on the amount that it may charge back to Grace with respect to gradual pollution claims.[13] Moreover, Grace has not presented any admissible evidence demonstrating that such a cap has been exhausted. The District Court did not err in denying Grace's renewed motion for summary judgment or to amend its cross-claim.

### CONCLUSION

For these reasons, we affirm the judgment of the District Court with respect to the 1973 and 1976 Policies, and we vacate the judgment of the District Court with respect to the 1983 Policy and remand to the District Court for proceedings consistent with this opinion.

---

13. If this fact were otherwise in doubt, the definitions contained in the 1990 settlement agreement explicitly state that "[a] claim seeking recovery from Grace–Conn. arising from potential environmental liabilities is not a Products Personal Injury [or Property Damage] Claim." (Posner Aff., Sept. 30, 1999, Ex. 1 at 4.)