**EMERSON ENTERPRISES, LLC, Plaintiff,**

v.

**KENNETH CROSBY NEW YORK, LLC, Jayne C. Summers, Clark Witbeck, Inc., Brian J. Cain, Barbara Goodrich, as Executor of the Estate of Vernon Goodrich, Dean Brodie, Curtis S. Kling, The Travelers Indemnity Co., John Doe Corporations, John Does, and John Doe Insurance Companies, Defendants.**

No. 03–CV–6530 CJS.

United States District Court,
W.D. New York.

March 1, 2011.

Alan J. Knauf, Esq., Knauf Shaw, LLP, Rochester, NY, for Plaintiff.

Patricia Dee Bilka, Esq., Lazare Potter & Giacovas LLP, New York, NY, for Defendant The Travelers Indemnity Company.

## DECISION AND ORDER

CHARLES J. SIRAGUSA, District Judge.

## INTRODUCTION

This is an action pursuant to, *inter alia*, the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601, *et seq.*, the Resource Conservation Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.*, the New York Environmental Conservation Law ("ECL"), and New York Navigation Law. Now before the Court is a motion for summary judgment [# 308] by defendant The Travelers Indemnity Co. ("Travelers"). For the reasons that follow, the application is granted.

## BACKGROUND

The history of this action is set forth in numerous prior decisions by this Court (Docket Nos. [# 165] [# 225] [# 227] [# 263] [# 264] [# 303] ). For purposes of the instant Decision and Order it is sufficient to note the following facts.

This action involves environmental contamination of a parcel of land owned by Plaintiff, known as 640 Trolley Drive ("640 Trolley Drive," "the property," or "the site") in the Town of Gates, New York. Prior to 1960, the property was vacant land. In the 1960's, Plaintiff's predecessors constructed a 12,300 square-foot masonry structure on the property. At all relevant times, Plaintiff has either used or leased the property, for commercial purposes. Defendant Clark Witbeck, Inc. ("Clark Witbeck") leased the property from the early 1960s until 1992. Clark Witbeck used the property to sell industrial tools and supplies, including a liquid cutting oil, known as Cimcool, which was manufactured by the Cincinnati Milacron Company ("Cincinnati Milacron"). Cimcool was packaged in pink, 55–gallon steel drums and five-gallon pails. At all relevant times, Cimcool contained mineral oil. Moreover, prior to 1979, Cimcool contained Aroclor 1254, which is a polychlorinated biphenyl (PCB).

From the early 1960's until approximately May 1980, Clark Witbeck was owned by Curtis Kling ("Kling"). In or about May 1980, Dean Brodie ("Brodie") and Vernon Goodrich ("Goodrich") purchased Clark Witbeck, and continued to operate the business at the leased premises. In 1987, Brodie and Goodrich sold the corporation to Brian Cain ("Cain"). Cain owned Clark Witbeck until 1992, when the company ceased doing business and sold some of its assets to Kenneth Crosby New York, LLC ("Crosby"). Crosby continued to operate a business at the site, and to sell Cimcool cutting fluid, until approximately 2000.

Ron Spinelli ("Spinelli") began working for Clark Witbeck in 1966, when Kling was the owner, and continued to work there until 1992. (Spinelli Deposition at 17). Spinelli testified that during his employment with Clark Witbeck, there was a "pit" or "dry well" in back of the property. *Id.* at 22, 24. The pit was eight-to-ten-feet

away from the northwest door of the building. *Id.* at 31. Spinelli indicated that over a period of years, Clark Witbeck employees dumped quantities of Cimcool, that was either discontinued or unwanted by customers, into the dry well. *Id.* at 22, 24. Spinelli, who worked on the northeast side of the building, testified that workers on the northwest side of the building dumped the liquid. *Id.* at 24–27. Specifically, Spinelli testified, in relevant part:

Q. ... Who would put material in the dry well?

A. Actually dump the barrels?

Q. Yes.

A. I knew it was the guys on the other side of the warehouse. I don't even know who they were. I mean, I don't remember the names. I'm not sure. But I know it was—like I say, we divided the building in half and the guys that worked on the tool side are the ones. Whoever told them to go dump it, which I'm assuming at that time would have been Curt [Kling], they would just go and dump the drums. But I don't know who they were. I can't remember.

Q. Okay. So was it your understanding that was kind of—that was the standard procedure, to—when there was discontinued material, that it would be put in the dry well?

A. Yes.

*Id.* at 24–25. According to Spinelli, the area surrounding the pit was frequently flooded with groundwater, and on one occasion he observed foam over the pit. *Id.* at 51.

Monty Alberts ("Alberts") worked for Clark Witbeck between approximately 1980 [1] and 1992. Alberts testified that approximately one-to-two years after he began working for Clark Witbeck, an official from the Town of Gates informed Clark Witbeck that there were barrels on the land behind the warehouse that had to be removed. (Alberts Deposition at 23–29, 65). Alberts helped remove a number of empty, dirty, rusted barrels from an overgrown area behind the warehouse. *Id.*[2] Alberts stated that someone at Clark Witbeck told him that, at a prior point in time, employees would dispose of leaking drums in an area called the pit: "And it was kind of brought to our attention that *at a time* they called the area 'the pit.' And if they had a leaking drum, they would put it out there." *Id.* at 24 (emphasis added); *see also, id.* at 30 ("[I]t came to my knowledge that at one time if they had what they called a leaker, they would dispose of it by pushing it out the back door. That's how the drums got there."); *id.* at 103 ("I believe the practice was if they had a leaker, it was to put [it] out in the rear. But I can't tell you for certain."). Alberts testified that to his knowledge, Clark Witbeck stopped using the pit prior to 1980:

Q. And did anyone give you any information as to when this pit was used?

A. I can only tell you that it was prior to me being there.

\* \* \*

[Q.] Mr. Alberts, when you say prior to you being there, do you mean prior to

---

1. The record indicates that Brodie and Goodrich purchased Clark Witbeck in May 1980. Alberts testified that he was hired by Brodie "six months to a year" later. (Alberts Dep. at 56–57).

2. John Hale, one of the Clark Witbeck employees who physically removed the barrels

from behind the warehouse, described the barrels: "They were all rusted. There was no way to tell what color. They had been there for many years." (Hale Dep. at 12); *id.* at 38 ("[T]hey were just rotted so bad, not crushed, they were just dented in, not in barrel shape any longer.").

the start of your employment in approximately 1980?

[A.] Correct.

*Id.* at 32.

In or about 1987, the dry well was covered with soil, when Plaintiff re-graded the property. (Kohrn Deposition at 99–100). There is no indication that Plaintiff was aware of the dry well's existence when it re-graded the property. Plaintiff subsequently leased the property to a new tenant. On or about October 27, 2000, the new tenant uncovered the buried dry well, while using a bulldozer to clear land behind the building in preparation for constructing a parking area. The dry well contained dark, foul-smelling liquid. Upon being notified of the contamination, the New York Department of Environmental Conservation ("NYDEC") listed the property on the state's Registry of Inactive Hazardous Waste Disposal Sites. By letter dated August 28, 2001, the NYDEC informed Plaintiff of its intention to investigate and possibly seek clean-up costs at the site. The NYDEC subsequently arranged for the removal of the dry well in January 2002. The NYDEC has demanded that Plaintiff pay for the investigation and remediation at the property.

In March 2002, the NYDEC issued a "Preliminary Site Assessment Report" for the property. (Plaintiff's Statement of Facts, Exhibit L). The report "confirmed disposal of PCBs, 1,1,1–TCA [trichloroethane], and acetone in the dry well located immediately north of the northwest rear door of the 640 Trolley Boulevard building." *Id.* at 4–1. The report described the dry well as "a four-by-four disposal pit that was staked and lined with cinder blocks and/or stone." *Id.* at 1–3. Additionally, the report described the dry well as "a soil pit approximately 3.5 feet deep, filled with debris consisting of concrete pieces, round concrete blocks, and metal rods." *Id.* at 2–7.

As for remediation, the DEC determined that it was necessary to remove soil from two locations on the property, north of the building: (1) "the area [of] the former dry well/disposal pit;" and (2) "the area where regrading occurred and soil was historically stockpiled during past parking lot expansion activities." (Plaintiff's Cross Motion [# 320], Ciufo Affidavit, Exhibit C, DEC "Record of Decision" dated March 2009, at ii).

Plaintiff demanded that Travelers defend and indemnify it as a named additional insured under the commercial general liability policies purchased by Clark Witbeck. However, Travelers denied coverage, relying, in part, on the policies' pollution exclusion.

Plaintiff commenced the subject action on October 29, 2003. The Second Amended Complaint ("the Complaint") [# 100] purports to allege two causes of action against Travelers 1) a claim for a declaratory judgment that Travelers is required to defend and indemnify Plaintiff for claims to clean up the contamination; and 2) a claim that Travelers is strictly liable under New York Navigation Law § 190 for the costs of investigating and removing the contamination. (Second Amended Complaint ¶¶ 160–168). Plaintiff maintains that Travelers "issued policies to Clark Witbeck, and named [P]laintiff or its predecessors as an additional insured, between about March 1, 1988 and June 1, 1991." *Id.* at ¶ 40. Travelers admits that it issued policies to Clark Witbeck for the period March 1, 1988 to June 1, 1990, but denies that it issued any policy covering the period June 1990 to June 1991.

The Complaint alleges that the cause of the contamination was "dumping of contaminants into the dry well." *Id.* at ¶ 72. The Complaint states that such contami-

nants later flowed out of the dry well, either below ground by leaching into the soil, or above ground as a result of flooding, and that the release of contaminants "occurred in a sudden and accidental manner." *Id.* at ¶¶ 88–89. The Complaint further contends that in 1994, Kenneth Crosby employees placed contaminants in a dumpster which leaked (*Id.* at ¶ 76). However, such event would have been after the period during which Travelers allegedly provided insurance coverage.

During discovery, Plaintiff provided a report from its expert, environmental scientist S. Bruce Kohrn ("Kohrn").[3] In his report, Kohrn states, in pertinent part:

It is likely that contamination ... seeped out of the dry well into the soil and groundwater on a continual basis between the 1960s and 2001.

\* \* \*

Furthermore, on occasion until it was removed, the dry well was inundated with precipitation, which caused contamination from the dry well to accidentally escape on the surface over a short period of time, and spread by surface water flow to other areas of the property, including flow through the swale ... to the future parking area, contaminating that area with PCBs and petroleum constituents.

Kohrn Expert Report, ¶¶ 7, 9. Moreover, in connection with prior motions filed in this action, Plaintiff identified two possible sources of contamination on the property: 1) intentional dumping into the dry well, and subsequent spreading of such contamination across the property due to the dry well overflowing; and 2) the 1994 dumpster spill, which post-dates Travelers' coverage. *See, e.g.,* Ciufo Affidavit [# 154–3] at ¶¶ 24–27. Plaintiff suggests that there

may be other causes for the contamination, but it has not identified any such other cause. *See, id.*

Following the completion of discovery, Travelers filed the subject motion for summary judgment [# 308]. Travelers maintains that it is entitled to summary judgment, because the subject policies all exclude coverage for intentional pollution. In that regard, Travelers states that it issued three policies to Clark Witbeck: 1) one covering the period March 1, 1988 to June 1, 1988; 2) one covering the period June 1, 1988 to June 1, 1989; and 3) one covering the period June 1, 1989 to June 1, 1990. Travelers further indicates that all three policies contained the following exclusion provision:

This insurance does not apply ... to bodily injury or property damage arising out of any emission, discharge, seepage, release or escape of any liquid, solid, gaseous or thermal waste or pollutant if such emission, discharge, seepage, release or escape is either expected or intended from the standpoint of any Insured or any person or organization for whose acts or omissions any Insured is liable[.]

Affidavit of Robert J. Harris, ¶ 7. As Travelers correctly maintains, this Court has already ruled that the dumping of contaminants into the dry well was intentional, not accidental. *See, e.g.,* Decision and Order [# 303] at 22 ("Here, it seems clear that the waste was put in the dry well to be dispersed into the ground[.]"). Alternatively, Travelers states that even if coverage is not excluded, Plaintiff has failed to show that it was an additional insured under the policy covering the period of March 1988 to June 1988. And finally, in the event that its summary judgment mo-

---

**3.** In a prior Decision and Order in this action, the Court held that most of Kohrn's expert report was inadmissible, pursuant to Federal Rule of Evidence 702.

tion is denied, Travelers asks that it be severed from the other Defendants for trial.

In response, Plaintiff maintains that it has come forward with evidence that Travelers issued a policy covering the disputed period of June 1, 1990 to June 1, 1991. Plaintiff admits, though, that such policy would have contained the same pollution exclusion as the earlier policies.[4] Nevertheless, Plaintiff insists that the pollution exclusion does not bar coverage. On this point, Plaintiff first argues that Travelers is liable for any pollution that escaped from the dry well, since even if the initial disposal of pollution into the dry well was intentional, the subsequent spread of such pollution was not intentional:

> The language in the Travelers Policies ... specifically contemplate[s] coverage for the *consequences of the initial act,* in that coverage exists for things such as *seepage and escape,* so long as they were not expected or intended. As such, with regard to the 'escape' or 'release' of a liquid from overflow of the dry well, Travelers has the burden of showing that such 'escape' or 'release' was actually expected or intended from the standpoint of an insured. Not only has [Travelers] failed to come up with any such evidence, but *Plaintiff's expert is of the opinion that accidental overflows* [of the dry well] *caused some of the contamination on the property....* Even if the disposal of liquid into the dry well was expected or intended from the standpoint of Clark Witbeck, Travelers has failed to come forth with sufficient facts to meet [its] burden to show that any 'escape' or 'release' of liquid due to the overflow of the dry well was

'expected' or 'intended' from the standpoint of Clark Witbeck[.]

Pl. Memo. of Law at 23–24 (emphasis added). Additionally, Plaintiff contends that some of the pollution on the property may have come from other sources besides the dry well. And finally, Plaintiff maintains that there are issues of fact as to whether Clark Witbeck *intentionally* dumped pollutants into the dry well, since the Court previously denied Plaintiff's motion for summary judgment against Clark Witbeck.

## ANALYSIS

### *Summary Judgment Standard*

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew,* 75 F.3d 98, 107 (2d Cir.1996)(*citing Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)), *cert.*

---

4. Pl. Memo of Law at 20 ("The plaintiff concedes that the terms of the [disputed policy] would have included a pollution exclusion with a 'unexpected and unintended' exception.").

*denied,* 517 U.S. 1190, 116 S.Ct. 1678, 134 L.Ed.2d 780 (1996).

The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505; *see also,* FED.R.CIV.P. 56(e)("When a motion for summary judgment is made and supported as provided in this rule, and adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy,* 988 F.2d 303, 308 (2d Cir.1993). The parties may only carry their respective burdens by producing evidentiary proof in admissible form. FED. R.CIV.P. 56(e). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

A party cannot rely on speculation to defeat a properly-supported summary judgment:

> In order to defeat a properly supported summary judgment motion, the opposing party must proffer admissible evidence that sets forth specific facts showing a genuinely disputed factual issue that is material under the applicable legal principles. A party opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory, or based on speculation[.]

*Major League Baseball Properties, Inc. v. Salvino, Inc.,* 542 F.3d 290, 310 (2d Cir. 2008) (citations and internal quotation marks omitted). Moreover, the party opposing summary judgment may not create a triable issue of fact "merely by submitting an affidavit that disputes his own prior sworn testimony." *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996) (citations omitted). Rather, such affidavits are to be disregarded. *Mack v. United States,* 814 F.2d 120, 124 (2d Cir.1987) (citations omitted).

■ The parties agree that this Court must apply the law of New York State in deciding whether the policies' pollution exclusion bars coverage for Plaintiff. Under New York law,

> to negate coverage by virtue of an exclusion, an insurer must establish that the exclusion is stated in clear and unmistakable language, is subject to no other reasonable interpretation, and applies in the particular case and that its interpretation of the exclusion is the only construction that could fairly be placed thereon. Under New York insurance law, the burden, a heavy one, is on the insurer, and if the language of the policy is doubtful or uncertain in its meaning, any ambiguity must be resolved in favor of the insured and against the insurer.

*Parks Real Estate Purchasing Group v. St. Paul Fire and Marine Ins. Co.,* 472 F.3d 33, 42 (2d Cir.2006) (citations and internal quotation marks omitted).

As discussed above, the pollution exclusion in the subject policies issued by Travelers states as follows:

This insurance does not apply ... to bodily injury or property damage arising out of any emission, discharge, seepage, release or escape of any liquid, solid, gaseous or thermal waste or pollutant if such emission, discharge, seepage, release or escape is either expected or intended from the standpoint of any Insured or any person or organization for whose acts or omissions any Insured is liable[.]

Affidavit of Robert J. Harris, ¶ 7. The terms "expected or intended" in this context "look to whether the discharge was intentional." *Town of Union, N.Y. v. Travelers Indem. Co.*, 906 F.Supp. 782, 787 & n. 4 (N.D.N.Y.1995) (Stating that with regard to pollution exclusions that use the terms "expected" and "intended" or "sudden and accidental," the focus in either case is whether the pollution was intentional). Moreover, the terms "expected or intended" modify the initial "emission, discharge, seepage, release, or escape" of pollutants, not the subsequent damage caused. *See, Agway, Inc. v. Agway Petroleum Corp. ("Agway")*, 930CV–557, 1993 WL 771008 at *16 (N.D.N.Y. Dec. 6, 1993) ("In the pollution exclusions, whether we are speaking of the 'intended or expected' or the 'sudden and accidental' version, these words clearly modify the discharge of the pollution which ultimately results in damage.... These exclusions, and the courts interpretations thereof, reflect a desire to avoid defeating the cost disincentives of environmental protection legislation by indemnifying polluters for their irresponsible dumping of toxic materials.") (Cholakis, J.). As the Court stated in *Agway*, "there is no reasonable way to construe intended disposal as an unintentional discharge, despite the fact that subsequent contamination may not have been intended or expected." *Id.*, 1993 WL 771008 at *18 (citations omitted); *see also, Ogden Corp. v. Travelers Indem. Co.*, 924 F.2d 39, 42 (2d Cir.1991) ("Under New York law, the contamination of a site is accidental when the conduct, the activity resulting in pollution, was unintended.") (citations omitted).[5]

■ In the instant case, Plaintiff maintains that contamination caused by "accidental overflows" of the dry well is covered under the subject policies. *See*, Pl. Memo of Law at 23–24 ("The language in Travelers' policies ... specifically contemplate[s] coverage for the consequences of the initial act, in that coverage exists for things such as seepage and escape, so long as they were not expected or intended."). In this regard, Plaintiff concedes that pollutants were intentionally dumped into the dry well. Moreover, this Court has already ruled that a dry well is a device for dispersing liquid into the ground, and as such, is entirely unlike a storage tank. Nevertheless, Plaintiff maintains that the overflow of pollution residue from the dry well onto the surrounding land, due to the occurrence of rain and/or melting snow,

**5.** *See also, Employers Ins. of Wausau v. Duplan Corp.*, 899 F.Supp. 1112, 1121 (S.D.N.Y. 1995) ("It should be noted that the focus of the "sudden and accidental" inquiry is upon the act of "discharge, dispersal, release or escape," not upon the pollution itself. Pollution may be entirely unintended, but if it results from intentional and systematic discharge the liability arising from the pollution will not fall within the ambit of the exception. It is therefore irrelevant under this analysis whether the resulting *pollution* was unexpected or unintended.") (emphasis in original, citation omitted); *Technicon Electronics Corp. v. American Home Assur. Co.*, 74 N.Y.2d 66, 75, 544 N.Y.S.2d 531, 533–534, 542 N.E.2d 1048 (1989) ("[T]he pollution exclusion clause, by its own terms, does not distinguish between intended or unintended consequences of intentional discharges; rather, it excludes from coverage liability based on all *intentional* discharges of waste whether consequential damages were intended or unintended.").

was an accidental and unintended "emission, discharge, seepage, release or escape." The Court disagrees, and holds, as a matter of law, that coverage for any contamination caused by the overflow of the dry well is clearly and unambiguously excluded by the Travelers policies.

Alternatively, Plaintiff contends that some of the pollution on the property may have come from other sources besides the dry well, and that Travelers has not proven that *all* of the complained-of pollution originated from pollutants that were dumped into the dry well.[6] On this point, Ciufo states: "I believe that the contamination resulted from not only the intentional dumping in the pit, but also accidental spilling of wastes from operations in the building conducted by past tenants, and the spread of wastes throughout the property by surface and ground waters." Ciufo Affidavit [# 320–2] ¶ 30. According to Plaintiff, Travelers cannot win summary judgment unless it proves that all of the pollution on the property came from the dry well, or was otherwise intentional. Pl. Memo of Law at 24.

■ However, the Court again disagrees. In deciding whether an insurer has a duty to defend, courts look to the allegations in the complaint. *See, e.g., Bruckner Realty, LLC v. County Oil Co., Inc.,* 40 A.D.3d 898, 900, 838 N.Y.S.2d 87, 89 (2d Dept.2007) ("An insurer may also disclaim coverage on the basis of a policy exclusion by demonstrating that the allegations of the complaint cast that pleading solely and entirely within the exclusion.") (citations omitted). On the other hand, in determining whether an insurer has a duty to indemnify, a court must look to "the actual basis of the insured's liability."

*Robbins v. Michigan Millers Mut. Ins. Co.,* 236 A.D.2d 769, 653 N.Y.S.2d 975, 977 (3d Dept.1997) (citation omitted). The record in this case does not indicate that Travelers has a duty to defend or indemnify. Plaintiff's Second Amended Complaint, under the heading "THE CAUSE OF THE CONTAMINATION," identifies only two such possible causes: 1) intentional dumping into the dry well and subsequent spread of such contaminants; and 2) the 1994 dumpster spill. Second Amended Complaint ¶ ¶ 72–76, 88. Moreover, after years of discovery and investigation, Plaintiff has not identified any additional cause for the contamination. Consequently, there is no evidentiary proof in admissible form that any such accidental spill actually occurred, let alone within the period covered by Travelers' policies.

Still, Plaintiff contends that the widespread nature of the contamination across the property suggests that all of the pollution did not come from the dry well. Pl. Memo of Law at 24. For example, Plaintiff states that contamination was found in the parking area some distance from the dry well, and that, "[t]here is no evidence in the record that links all of this contamination to the dry well, and in fact this is not a likely conclusion." *Id.* However, Plaintiff's own expert expresses the opposite opinion, and states that pollution migrated from the dry well to other areas of the property, including the parking lot. *See,* Kohrn Report, ¶ 9 ("[O]n occasion until it was removed, the dry well was inundated with precipitation, which caused contamination from the dry well to accidentally escape on the surface over a short period of time, *and spread by sur-*

---

**6.** *See,* Pl. Memo of Law at 23 ("[F]or the exclusion to apply Travelers has the burden to show that there was *no* emission, or discharge, or seepage, or release, or escape, of

*any* liquid, or solid, or gaseous waste, or thermal waste, or pollutant, that was either *not expected* or *not intended* from the standpoint of any insured.") (emphasis in original).

face water flow to other areas of the property, including flow through the swale ... to the future parking area, contaminating that area with PCBs and petroleum constituents.") (emphasis added). Accordingly, the Court finds that Travelers has met its burden of proving that the policies' pollution exclusion bars coverage for the contamination in this action.

Lastly, Plaintiff maintains that there are issues of fact as to whether Clark Witbeck *intentionally* dumped pollutants into the dry well, since the Court previously denied a motion by Plaintiff for summary judgment against Clark Witbeck.[7] The Court agrees that it previously denied summary judgment to Plaintiff against Clark Witbeck, finding that there were triable issues of fact. *See,* Decision and Order [# 303] at 24–25. The Court, though, did not find an issue of fact as to *whether* pollutants were intentionally dumped in the dry well. Instead, the Court found that it was unclear exactly *who* did the dumping, since Spinelli's testimony on that point was equivocal:

> It appears fairly clear that at some point, someone constructed a dry well on Plaintiff's property, into which chemicals were dumped. What is less clear, though, is who did the dumping.... The only witness who appears to have first-hand knowledge liking Clark Witbeck to the dry well is Spinelli. However, Spinelli's deposition testimony is equivocal and ambiguous.

Decision and Order [# 303] at 24–25. The Court's ruling on this point does not create a triable issue of fact as to whether the complained-of pollution was accidental.

---

7.  *See,* Pl. Memo of Law at 24 ("[W]hile plaintiff [previously] argued that Clark Witbeck intentionally caused contamination by dumping in the dry well, this Court has denied summary judgment on that claim, finding that

CONCLUSION

Travelers' motion for summary judgment [# 308] is granted. The Clerk of the Court is directed to terminate Travelers from this action.

So Ordered.

issues of fact on that claim must go to trial. Thus, Travelers cannot prove, without a trial, that Clark Witbeck intended to cause the contamination.").